[Crim. No. 40184. Second Dist., Div. One. Nov. 10, 1981.]

In re RONALD RALPH NODAY on Habeas Corpus.

Counsel

Gerald Blank for Petitioner.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Pounders and Robert R. Anderson, Deputy Attorneys General, for Respondent.

Opinion

HANSON (Thaxton), J.—

PROCEDURAL HISTORY

Defendant Noday and codefendant Smart were by indictment each charged with seven counts, including grand theft, conspiracy to commit

grand theft, conspiracy to cheat and defraud, and conspiracy to commit murder. Noday's codefendant Maldonado was charged in two of the seven counts; Noday's codefendant Jones was charged in three of the counts.

Severance was granted to codefendants Smart and Jones; defendant Noday was tried with codefendant Maldonado. Both defendant and Maldonado were represented throughout the proceedings by Attorney Stephen Gillis. The matter of the joint representation of defendant and Maldonado was brought to the attention of two different trial judges by the prosecution. Twice, prior to trial, defendant Noday and codefendant Maldonado indicated, in response to questioning by the court, that they did not wish to retain separate counsel.

After trial codefendant Maldonado was acquitted. Defendant Noday was convicted of count III—conspiracy to commit grand theft and conspiracy to cheat and defraud, count IV—conspiracy to commit murder, and count VII—grand theft; he was sentenced to a life term in state prison. He appealed from the judgment of conviction, still represented by Attorney Gillis. This court affirmed the judgment on February 17, 1978, in an unpublished opinion (2 Crim. 30387). A hearing in the California Supreme Court was denied on April 13, 1978.

Represented by a new attorney, Noday filed a petition for a writ of habeas corpus in the trial court. That petition was denied. A petition for a writ of habeas corpus was then filed in this court, and we denied relief. On May 13, 1981, the California Supreme Court directed us to issue an order to show cause why the relief sought by defendant should not be granted. This was done, and we now consider the merits of this matter.

### THE UNDERLYING CASE

The three counts of which Noday was acquitted involved the purchases from Downey Savings and Loan on two separate occasions of certificates of deposit in the amounts of $100,000 and $220,000, respectively, with bad checks, one of which was written on Noday's account at a bank in the Bahamas, and the transfer of these certificates to others who attempted to use them as security for loans.

The charges of which defendant Noday was convicted were the consequence of a series of transactions in which he convinced Harold

Porter to deposit with Reliance Escrow, a company being purchased by defendant Noday, a cashier's check for $100,000 to be used short term to improve the balance sheet of that company and thus help Noday to qualify as purchaser of a bank. Noday promised that once he owned the bank he would assist Porter and Richard Allen to obtain a loan which they needed to purchase a business. Noday, then a signatory on the Reliance Escrow bank account, took Porter's $100,000. When Porter began to ask for the return of his funds, Noday apparently found him an obstacle to his plans and paid George Pelham $11,500 to murder Porter. Pelham reported that the homicide had been accomplished but in fact absconded with the money without carrying out the execution. When Noday discovered the deception, he sought to place a contract on the life of Pelham as well. Pelham finally contacted the FBI and helped them set up the events leading to Noday's arrest.

Following his conviction on the charges specified, Noday filed an appeal limited to his conviction on the conspiracy to commit murder. This court affirmed his conviction and the relevant facts are set forth in the unpublished opinion (2 Crim. 30387) attached hereto as appendix A.

### DEFENDANT NODAY'S APPLICATION FOR A WRIT OF HABEAS CORPUS

Defendant Noday presently claims, in essence, that he was deprived of effective assistance of counsel as a consequence of his own express waiver of the right to separate counsel, which he now seeks to invalidate. Previously retained counsel, Stephen Gillis, represented both defendant Noday and his codefendant and mother-in-law Consuelo Maldonado. Defendant Noday now claims his representation was impaired due to conflicts in the defense of the two defendants arising during or prior to trial.

The lengthy petition for habeas corpus is accompanied by exhibits, including the declarations of trial counsel, codefendant Maldonado and a codefendant (William Beverly Smart) whose trial was segregated, originally filed with the superior court. The complete trial record was ordered up and has been reviewed together with the reporter's transcript of the trial proceedings. The record reflects that codefendants Noday and Maldonado were by two different judges on two separate occasions questioned prior to trial and fully admonished with respect to the potential adverse consequences of multiple representation by Mr. Gillis.

The record shows that on September 23, 1976, prior to trial, defendant Noday and codefendant Maldonado were present in the trial court for a hearing initiated by the People to determine whether Noday and codefendant Maldonado waived their rights to separate counsel. The trial court (Judge William B. Ritzi) remarked, ". . . I want to advise you most emphatically— . . . [¶] that Mr. Gillis apparently is representing both of you. [¶] Now, that may present a very substantial conflict so far as your defense is concerned. In other words, Mrs. Maldonado and Mr. Noday, you may have defenses that are basically in conflict with the other. And, if so, you should be advised that it may injure you. [¶] Now, in my opinion, it would not be appropriate; however, the decision is yours. If you want Mr. Gillis to represent both of you, you are entitled to have him represent both of you. But you should realize—and I want to make it emphatically understood—that there may be a conflict of interest here that would injure either one or both of you." The judge asked codefendant Maldonado if she understood his remarks, and she replied: "Yes, I do." The judge then asked Maldonado if she wanted Mr. Gillis to represent her, and she replied: "Yes, I would, Your Honor." He then asked Maldonado, "With that understanding, do you waive any conflict of interest?" She replied: "Yes, sir." After Maldonado's reply, the judge asked Noday, "Now, do you understand that also, Mr. Noday." He replied: "Yes, I do." The judge then inquired whether Noday wanted Mr. Gillis to represent him, and he replied: "Yes." Upon receiving that answer, the judge asked Noday, "Do you waive any conflict of interest?" He replied: "Yes."

A second hearing on the subject took place on December 6, 1976, the day that trial was scheduled to commence before Judge Kathleen Parker. The district attorney indicated that the trial judge desired that the question of a "conflict of interest waiver" be explored and the waiver once more confirmed prior to trial. The following colloquy thereafter occurred: "THE COURT: It occurred to the court that there might be a conflict of interest between you [Noday] and Mrs. Maldonado. I know nothing about the case at this point, and I wanted to be sure that you understand that there is a possibility where you have two defendants represented by the same counsel that there may be a conflict of interest. [¶] I believe you have been advised of this previously, have you not? [¶] DEFENDANT NODAY: Yes. [¶] DEFENDANT MALDONADO: Yes. [¶] THE COURT: And it is my understanding that, despite a possible conflict of interest that may develop, you wish to have Mr. Gillis represent you in this case. [¶] DEFENDANT MALDONADO: Yes, ma'am. [¶] THE COURT: You also, Mr. Noday? [¶] DEFENDANT NODAY: Yes. [¶] THE COURT:

And you have talked that over with counsel, and you have talked about any possible conflict of interest? [¶] DEFENDANT MALDONADO: I have not talked with him at all, except what we talked about out in the corridor. [¶] THE COURT: Well, Mr. Gillis is of the opinion that there is no conflict of interest between the two of you, and he has so stated. [¶] Almost invariably where you have two defendants charged in a case, there is somewhere along the line a conflict of interest, or it might develop during the trial. [¶] Now, I just want to be sure that, despite that possibility, you still want Mr. Gillis to represent you. [¶] DEFENDANT MALDONADO: Yes, ma'am. [¶] THE COURT: And you also, Mr. Noday. [¶] DEFENDANT NODAY: Yes. [¶] THE COURT: All right. [¶] MR. GILLIS: Your Honor, for the record, I have discussed the charges with both defendants, and I know of no circumstances which could create a conflict."

After Noday and his codefendant Maldonado had agreed to their joint representation by Attorney Gillis, Gillis further stated that discovery obtained from the district attorney had not revealed any conflict of interest. The district attorney then advised Attorney Gillis and the court that some discovery material offered to Gillis 10 days before trial, but which Gillis had not yet obtained from the district attorney's office, consisting of tapes of telephone conversations between Noday and a government agent contained a reference to codefendant Maldonado which might implicate her. Attorney Gillis admitted that he had not read the transcripts of those tapes. The prosecutor then offered to brief him on how Maldonado's name came up. The court permitted an off-the-record discussion between counsel. The prosecutor then announced "I have told Mr. Gillis, as best my memory allows me, how Mrs. Maldonado comes up in the case." Without further discussion the trial proceedings resumed. Neither defendant Noday nor his codefendant Maldonado signed written consents to their joint representation by Attorney Gillis.

Attorney Gillis continued to conduct the defense of both defendants. However, in his opening statement for the defense he concentrated his comments on the innocence of Mrs. Maldonado. Mrs. Maldonado was involved only as an employee of Reliance Escrow during the period in question. He thereafter called her as a defense witness to explain that she started to work there in mid-November 1975, primarily answering the phones and delivering messages, and that she quit in January 1976. Meanwhile, she was there when the escrow agent, Louise Jones, discovered that her files had been burglarized. Mrs. Maldonado had not

disclosed her relationship to Ron Noday. Maldonado on direct testified that Louise Jones, a part-owner of Reliance Escrow (one of the three victims in the grand theft count), told Maldonado that "I believe this is the work of Steven Jones and Ron [Noday]." Mrs. Maldonado remained until January 21, 1976, when her apartment was burglarized. She reported this to Louise Jones who said that "maybe the same people that robbed me [Louise Jones] robbed you [Maldonado]." Noday claims that although this testimony was damaging to him Gillis made no attempt to impeach Maldonado or to have this evidence stricken. Gillis did, however, elicit testimony from Louise Jones, subsequently called, that Maldonado never told her about the burglary at Maldonado's apartment, thus implicitly denying the comment.

Defendant Noday did not testify in his own defense and claims that Gillis prevented him from so doing. Gillis presented no evidence to refute the prosecution's case with respect to Noday, explaining in his declaration that he had relied on the testimony of codefendant William Beverly (Bev) Smart, whose trial was segregated from that of defendants Noday and Maldonado, to exculpate Noday.

In his declaration dated August 8, 1980, Bev Smart alleges that he is currently imprisoned at Chino; that during the Noday trial he maintained almost daily contact with Stephen Gillis and obtained daily reporter's transcripts of the trial; that he repeatedly assured Gillis of his willingness to testify and to give exculpatory evidence on behalf of Noday; that he was acquitted of the charges of which Noday was convicted; that he often ate breakfast or lunch with Gillis or Mr. Noday's father in the criminal courts building; that he recalled that he had been seen eating alone with Gillis more than once by two or more trial jurors; and that his identity was well known to the jurors. Smart alleges specifically that "At some point in [Noday's] trial, without my knowledge or consent, Mr. Major [Smart's attorney] appeared and indicated I would not testify and if compelled to do so would decline based on the Fifth Amendment to the United States Constitution"; that his attorney was not authorized to do this; and that "[t]hereafter I continued to meet with Mr. Gillis and closely follow the progress of the trial. The topic of my testimony was never again discussed."

Gillis in his declaration alleges agreement with Smart's declaration and states: "My entire strategy in the proceedings in question depended on the testimony of Mr. Smart. Due to the availability of that testimo-

ny I felt I could represent both defendant Noday and defendant Maldonado without a conflict of interest. I now feel such a conflict existed even prior to the trial." Gillis further alleges that having Smart's testimony he believed Noday would not have to testify and there would be no chance of either client damaging the other; that he was caught off-guard and by surprise by a last minute change of heart by the now-deceased counsel for Smart; that due to the intervention of his attorney Smart did not testify and Gillis had no evidence with which to defend Noday on the conspiracy to commit murder and grand theft counts; that Noday wanted to testify and a conflict of interest developed because Gillis felt if Noday testified he might implicate Maldonado; that had he had any indication prior to trial that Smart would not testify he would have declared a conflict and declined multiple representation. Gillis finally alleges that the only offer made in pretrial negotiations by the prosecution was a dismissal of Maldonado in return for a plea by Noday, and that during the period of trial proceedings prior to opening argument defendant Noday was before the jury in jail garb.

Maldonado in her declaration alleges that after she and Noday were indicted by the grand jury Noday's father agreed to obtain defense counsel for her; that he obtained Stephen Gillis; that she paid no fee to Gillis; that prior to commencement of trial she never met with Gillis "other than in court"; that when questioned by the judge she did as she was told and said it was fine for Gillis to represent her as well as Noday; that she didn't understand the import of this; and that Gillis did not prepare her to testify or review her testimony with her prior to the time she took the stand.

The trial of these defendants was concluded on January 3, 1977. A review of the record as a whole discloses that throughout the trial Gillis vigorously opposed introduction of various items of evidence by the prosecution and engaged in cross-examination of various witnesses, some of whom were recalled to testify further during the defense. However, following the representation of Smart's counsel that his client would base his refusal to testify on the Fifth Amendment, Gillis declined to call Smart and rested the defense. Closing arguments to the jury were not transcribed.

There is no indication in the record that Gillis at any time informed the court that a conflict of interest had arisen or was present or that it influenced his decision to advise Noday not to testify and he did not

move for a mistrial. The issues of conflict of interest and ineffective assistance of counsel were not raised on Gillis' motion for new trial or on appeal.

## ISSUES

By this petition for a writ of habeas corpus defendant attacks the judgment of conviction basically contending (1) that his waiver of the right to separate counsel was ineffective; and (2) that he was deprived of effective assistance of counsel by an actual conflict of interest which adversely affected his trial lawyer's performance.

## DISCUSSION

### I

The constitutional right of a criminal defendant to the effective assistance of counsel is among those most zealously protected in both state and federal courts and it encompasses the right to retain counsel of defendant's own choosing. (*People* v. *Byoune* (1966) 65 Cal.2d 345, 348 [54 Cal.Rptr. 749, 420 P.2d 221].) The California Supreme Court has pointed out that the "state should keep to a necessary minimum its interference with the individual's desire to defend himself in whatever manner he deems best, using any legitimate means within his resources —and that that desire can constitutionally be forced to yield only when it will result in significant prejudice to the defendant himself or in a disruption of the orderly processes of justice unreasonable under the circumstances of the particular case." (*People* v. *Crovedi* (1966) 65 Cal.2d 199, 207-208 [53 Cal.Rptr. 284, 417 P.2d 868].)

In accord with this principle, a criminal defendant may request and obtain separate court-appointed or retained counsel (*People* v. *Chacon* (1968) 69 Cal.2d 765 [73 Cal.Rptr. 10, 447 P.2d 106]) or he may freely and voluntarily agree to dual or multiple representation by the same attorney, whether retained or court-appointed (*Klemm* v. *Superior Court* (1977) 75 Cal.App.3d 893 [142 Cal.Rptr. 509]; *People* v. *Superior Court* (*Mroczko*) (1979) 94 Cal.App.3d 626 [156 Cal.Rptr. 487]). A criminal defendant may also waive, knowingly and intelligently, the right to counsel and elect self-representation to present his case. (*Faretta* v. *California* (1974) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525].)

■ Defendant Noday in the petition before this court attacks the validity of his waiver of dual representation on grounds that it was not knowingly and intelligently given. The record, however, discloses that this defendant is a man of intelligence with the capability of planning and carrying forward transactions of a business nature which require considerable knowledge and sophistication.

In addition, he had by the time of these trial proceedings acquired some prior experience with courtroom proceedings as indicated by the fact that he was already incarcerated for a 15-year term in federal prison. The superior court file shows that at time of sentencing on February 7, 1977, before the trial judge (Kathleen Parker) the probation report was not ready and the probation officer requested another week to complete the report. Defendant Noday's counsel (Mr. Gillis) advised the court that "Mr. Noday is serving a 15-year federal sentence now, Mr. Noday was charged and convicted of first-degree murder, . . ."[1] The defendant would not agree to a week's continuance for the purpose of completing the probation report and requested immediate sentencing. He then waived a probation report and was sentenced as previously indicated. The foregoing is supported by the reporter's transcript of September 23, 1977, at the sentencing of Smart to state prison by Judge Delbert E. Wong, in which Smart's counsel advised the court that Noday was in the federal penitentiary at Leavenworth, Kansas.

When defendant Noday appeared before the court in the case at bench, he was questioned by two different judges. On both occasions he clearly and unequivocally declared his intention that Stephen Gillis was his free choice as counsel, and in respect to the court's admonition regarding the likelihood of a conflict, he indicated that he understood and accepted the risk.

---

[1] Defense counsel in his petition for a rehearing before this court (which was denied) filed photostatic copies of portions of two federal court files which reflect the following:

On May 18, 1976, following a guilty plea federal Judge Manuel L. Real in case No. 76-502 R sentenced defendant Noday to 10 years in the federal penitentiary for interstate transportation of stolen property from Los Angeles to Mexico on or about April 9, 1976, consisting of Mexican gold pesos with a value in excess of $10,000 knowing they were stolen.

On June 1, 1976, federal Judge Frances C. Whelan in case No. CR 76-501(a)-FW· sentenced defendant Noday to five years in the federal penitentiary for obstruction of justice. The sentence was initially stated in writing to run consecutive to the sentence imposed in case No. 76-502 R but on motion of defendant Noday was later amended to result in a concurrent sentence with the 10-year sentence imposed by Judge Real.

Judge Ritzi on September 23 stated to defendants Noday and Maldonado, amongst other things, "[I] want to make it emphatically understood—that there may be a conflict of interest here that would injure either one or both of you." The court asked Noday personally, "Now, do you understand that also, Mr. Noday?" Defendant Noday replied, "Yes, I do." Judge Ritzi then asked Noday if he wanted Mr. Gillis to represent him and Noday replied "Yes." Judge Ritzi then asked defendant Noday, "Do you waive any conflict of interest?" to which Noday replied, "Yes."

At the December 6 hearing before Judge Parker defendant Noday acknowledged that he had been previously advised that "there is a possibility where you have two defendants represented by the same counsel that there may be a conflict of interest." Judge Parker then asked of defendant Noday "and it is my understanding that, despite a possible conflict of interest that may develop, you wish to have Mr. Gillis represent you in this case." Defendant Noday replied, "Yes."

Thus, the Sixth Amendment waiver was established by clear, unequivocal and unambiguous language. (*United States* v. *Garcia* (5th Cir. 1975) 517 F.2d 272, 278.)

The trial court upon inquiry was in addition advised by Gillis that no conflict existed. In view of the ethical obligation of attorneys to avoid conflicting representation and to advise the court when a conflict arises, the court was entitled to rely upon this representation. Defendant Noday gave no hint of doubt or objection with respect to Gillis' representation. The only person to express doubt was the prosecutor at time of trial, when he mentioned the tape that revealed Maldonado's name. However, an off-the-record discussion with Gillis apparently satisfied him since he pursued the subject no further. In fact, with the aid of hindsight we observe that the reference to Maldonado on the tape obviously did not sufficiently implicate her to influence the jury which acquitted her on both counts.

Clearly a criminal defendant is not prohibited from retaining and utilizing the services of an attorney who represents additional codefendants, even though that course may to others seem unwise. (*People* v. *Cook* (1975) 13 Cal.3d 663, 671-672 [119 Cal.Rptr. 500, 532 P.2d 148]; see also *Holloway* v. *Arkansas* (1977) 435 U.S. 475 [55 L.Ed.2d 426, 98 S.Ct. 1173].) The United States Supreme Court has held that a defendant in a state criminal trial may knowingly waive his

right to counsel and represent himself regardless of the potential for serious adverse consequences resulting from such choice, and that in the aftermath of such self-representation the defendant may not complain with respect to the self-inflicted damages. (*Faretta* v. *California, supra*, 422 U.S. 806.) Similarly, although a criminal defendant is entitled to an effective defense, courts have carefully protected his right to choice of representation which necessarily includes the right to use the services of a retained lawyer who represents multiple defendants. Therefore, while it is incumbent upon the trial court to inquire into the circumstances sufficiently to ascertain that the waiver of separate counsel is knowing and intelligent, there is a limit upon the court's interference and the court need not initiate inquiries in every case. "[A]bsent special circumstances, therefore, trial courts may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist...." (*Cuyler* v. *Sullivan* (1980) 446 U.S. 335, 346-347 [64 L.Ed.2d 333, 345-346, 100 S.Ct. 1708], fn. omitted.) In the case at bench the trial court was aware that at prior proceedings the trials of codefendants Bev Smart and Jones had been segregated, thus presumably reducing the potential for conflict, and was assured by counsel that there was an absence of conflict between the two codefendants appearing for trial.

In summary, defendant has failed to demonstrate any fatal defect in the manner in which the trial court, on two separate occasions, explored his waiver of the right to separate counsel. To the contrary, the record discloses a knowing and intelligent waiver on the part of defendant Noday.

## II

■ Defendant Noday secondly contends that he was deprived of the effective assistance of counsel and has enumerated various alleged errors and omissions on the part of trial counsel in support of his claim. Multiple representation does not violate the Sixth Amendment unless it gives rise to a conflict of interest. In this regard it has been held that a defendant who objects to multiple representation should have the opportunity to demonstrate to the trial court the existence of potential conflicts; on the other hand a defendant who raised no objection must demonstrate that an actual conflict of interest adversely affected his lawyer's performance. (*Cuyler* v. *Sullivan, supra*, 446 U.S. 335, 348-350 [64 L.Ed.2d 333, 346-347].)

We have held that the defendant knowingly and intelligently waived his right to separate counsel in the face of an unambiguous and clear advisement by the court that joint representation could present a very substantial conflict so far as his defense is concerned. This holding constitutes an impediment to his claim that he was deprived of effective assistance of counsel.

Giving defendant the benefit of every doubt, he is nonetheless precluded from claiming this defect, which was not raised on appeal, except, possibly, with respect to actual conflict or evidence of ineffective assistance of counsel which was unrelated to the fact of multiple representation.

To put it another way, in view of the knowing and intelligent waiver and the strong warning given Noday by the court he can no more claim prejudice by reason of joint representation than a defendant could claim by reason of self-representation after a *Faretta* waiver.

In any event, as a practical matter, Noday's claims pertaining to any prejudice suffered by reason of the conflict of interest problem which developed are essentially encompassed in or subsumed by Noday's complaints in respect to ineffective representation discussed below. If Noday could properly establish ineffective representation, he would, in effect, be afforded the very relief sought by reason of any conflict of interest.

■ Defendant Noday initially claims Gillis rendered ineffective assistance by (1) conducting an inadequate investigation of the case before advising clients and court of the absence of conflict; (2) not advising his clients of the risks in dual representation; (3) failing to obtain their written consents to dual representation; and (4) misleading the court into believing the conflict situation had been adequately handled. Clearly these allegations, even if true, were cured by the court's interrogation of defendant Noday as to his waiver on two occasions, set forth above.

Gillis admits the truth of defendant Noday's further allegations that Gillis frequently and in view of jurors lunched with Bev Smart, charged as a coconspirator, and that Gillis permitted defendant to appear in court during jury voir dire in jail clothing. At the time trial commenced and opening argument was made to the jury defendant appeared in a business suit and Gillis' declaration discloses no reason for his earlier

appearance in jail apparel. Defendant apparently gave no indication of a preference for more suitable dress nor does he suggest that he objected at trial to having Smart in the courtroom or to Smart's socializing with defense counsel. It cannot be said that these circumstances alone, neither of which is related to Gillis' dual representation, constituted significant evidence of ineffective assistance of counsel.

■ Defendant Noday, in addition, alleges that Gillis slighted Noday in his opening statement for the defense and elicited testimony damaging to Noday from Maldonado. The record discloses that Gillis emphasized Maldonado's ignorance and innocence in opening argument while making minor reference to defendant Noday. Again this does not constitute sufficient evidence that Noday had ineffective assistance of counsel since we may surmise that this was a tactical decision. As to Maldonado's testimony, her reference to a hearsay statement by Louise Jones was directly refuted by Louise Jones' own testimony when she specifically denied the conversation. In the absence of a record, we may not assume that Gillis' closing argument to the jury pointed out Maldonado's credibility thereby by implication discrediting defendant or defendant's failure to testify, as he argues.

■ We turn now to the principal thrust of defendant Noday's claims which relate to Gillis' failure to present an exculpatory defense for him, his refusal to permit defendant to testify, his failure to make the existence of a conflict known to the court when he became aware of it or to make a record of its existence, and to fail to raise the presence of conflict on his motion for new trial or on appeal. It may be inferred from the declarations of Gillis and Smart that Gillis in planning trial strategy relied heavily upon the promised exculpatory testimony of Smart, who established himself as a friendly witness, lunched with Gillis, obtained trial transcripts presumably for his own benefit, yet was not called as a witness after his attorney (allegedly without Smart's knowledge or consent) represented that Smart would seek Fifth Amendment protection. Gillis in the absence of Smart's testimony nonetheless advised Noday not to take the witness stand out of a purported concern that he would implicate Maldonado and thus we are told an actual and unforeseen conflict arose.

Accepting as true the assertion that the circumstances were unforeseen, this does not supply grounds for relief. *Nowhere in the entire record, in the declarations of Gillis or Smart or the allegations and petition filed by Noday, is there a hint of the nature of the allegedly*

*exculpatory testimony Smart might have given, or to which Noday might have testified.*

It is now well established that in order for a criminal defendant to raise the issue of ineffective assistance of counsel he must demonstrate that by counsel's failure to perform his obligations the defendant was deprived of a "potentially meritorious defense." (*People* v. *Pope* (1979) 23 Cal.3d 412, 424-425 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R. 4th 1].) While the conduct of trial counsel insofar as he failed to draw his predicament to the attention of the trial court to seek a solution, or to seek review of the issue on subsequent appeal should not be condoned, the record presented to this court fails to demonstrate grounds for habeas corpus relief.

As recently as 1980 in *People* v. *Jackson* (1980) 28 Cal.3d 264, 294 [168 Cal.Rptr. 603, 618 P.2d 149], the California Supreme Court in affirming a death penalty case on automatic appeal also denied the defendant's petition for habeas corpus relief based on his claim that he was ineffectively represented by trial counsel citing as authority and thereby reaffirming its holding in 1969 in the case of *People* v. *Hill* (1969) 70 Cal.2d 678 [76 Cal.Rptr. 225, 452 P.2d 329].

In *People* v. *Hill, supra,* 70 Cal.2d 678, the state Supreme Court said at pages 690-691: "To sustain a claim of inadequate representation by reason of failure to call a witness, there must be a showing from which it can be determined whether the testimony of the alleged additional defense witness was material, necessary, or admissible, or that defense counsel did not exercise proper judgment in failing to call him. (*People* v. *Lugo, supra,* 220 Cal.App.2d 54, 59 [3] [33 Cal.Rptr. 572].)"

In the case at bench defendant Noday has failed to make a showing that there were in fact exculpatory circumstances, and that Smart's testimony would have disclosed a meritorious defense, or that the reasons defendant Noday failed to testify were in fact the result of a conflict rather than a strategy formulated on other grounds.

Defendant Noday, who is presumably most intimately familiar with the events, fails to allege the substance of the testimony which he claims he might have given in his own defense. For example, of particular significance would be his (Noday's) testimony to rebut the evidence consisting of the FBI taped telephone conversations between himself (Noday) and Pelham on April 8, 1976, wherein Noday offered Pelham

$50,000 (less $11,500 he had already given Pelham to murder Porter) to murder Dave Powers and Mark Coffman, government witnesses in a federal prosecution against him (Noday). (See appen. A.)

Although defendant Noday argues that Gillis presented no evidence in his defense as a result of Smart's defection, the record shows that Gillis vigorously attacked the admission of various items of prosecution evidence and cross-examined witnesses on behalf of the defense. There is no showing that defendant was prejudiced by his failure to testify.

## III

In summary, this case involves a defendant who is presently serving a federal sentence (see fn. 1, *ante*) concurrently with the sentence in the instant case and who now seeks this court to afford him a new trial in the instant case and a second bite at the apple after being convicted by jury for conspiracy to commit murder in early 1976 (over five years ago), a conviction which was affirmed by this court in early 1978 (over three and one-half years ago).

Defendant Noday is subject to the same laws as all convicted California felons—no more and no less.

We hold that defendant Noday knowingly and intelligently waived his right to separate trial counsel having first been clearly advised by the court that joint representation could "present a very substantial conflict so far as [his] defense is concerned."

We further conclude that the defendant's claim of ineffective representation of counsel, which essentially comprises his claims pertaining to prejudice suffered by him by reason of the conflict of interest problem, also fails in that he has not disclosed to this court the testimony of the alleged additional defense witness(es) from which we can determine whether or not such testimony is material, necessary or admissible or whether or not the defense counsel did not exercise proper judgment in failing to call such witness(es), as required by law.

We agree with the dissent that a ban on joint representation in felony matters or, alternatively, the mandatory severance of trials in which co-defendants employ joint representation would be an expedient means of eliminating the problems of joint representation. However, we are mindful both of the increasing expense of legal representation and the

onerous burden which the mandatory severance of trials could impose upon the courts. At present, meaningful data on the scope of the problems of joint representation—the percentage of instances in which conflicts occur of sufficiently substantial magnitude to interfere with effective representation—simply is not available. Accordingly, we consider the problem to be one which is primarily the responsibility of the State Bar and call upon that body to meet the challenge of investigating the facts and developing rules of professional conduct sufficiently stringent to alleviate the worst aspects of joint representation.

## DISPOSITION

The petition for a writ of habeas corpus is denied.

Spencer, P. J., concurred.

**DALSIMER, J.**—I respectfully dissent.

Traditionally, waiver has been defined as "... an intentional relinquishment or abandonment of a known right or privilege." (*Johnson* v. *Zerbst* (1938) 304 U.S. 458, 464 [82 L.Ed. 1461, 1466, 58 S.Ct. 1019, 146 A.L.R. 357].) The right to the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and by article I, section 15 of the California Constitution is a fundamental right. "'It has been pointed out that "courts indulge every reasonable presumption against waiver" of fundamental constitutional rights ....' [Citation.]" (*People* v. *Douglas* (1964) 61 Cal.2d 430, 434-435 [38 Cal.Rptr. 884, 392 P.2d 964].) In discussing whether a defendant had waived his right to counsel, the Supreme Court stated that "..: 'a finding of waiver is not lightly to be made.' [Citation.]" (*Id.*, at p. 434.) The *Douglas* court explained, "Not only must the waiver be unqualified, but it may be made only by a defendant who has been apprised of his rights and who has 'an intelligent conception of the consequences of his act.' [Citation.]" (*Id.*, at p. 435.)

The majority relies on *United States* v. *Garcia* (5th Cir. 1975) 517 F.2d 272 in its evaluation of whether Noday made an effective waiver. In that case, the court of appeals held that the trial court "... should address each defendant personally and forthrightly advise him of the potential dangers of representation by counsel with a conflict of interest," and "[m]ost significantly, the court should seek to elicit a

*narrative* response from each defendant that he has been advised of his right to effective representation, that he understands the details of his attorney's possible conflict of interest and the potential perils of such a conflict, that he has discussed the matter with his attorney or if he wishes with outside counsel, and that he voluntarily waives his Sixth Amendment protections. [Citation.]" (*Id.*, at p. 278, italics provided.)

In the present case, the waiver proceedings consisted essentially of monosyllabic responses to the judges' questions. Those responses were wholly insufficient to indicate that Noday understood even the nature of the problem, much less the implications thereof. Indeed, there was no effort to ascertain if Noday comprehended the meaning of the term "conflict of interest."

Defendant Noday was insufficiently apprised of his rights because at neither waiver hearing was the term "conflict of interest" adequately explained. We simply cannot assume an understanding by this or any layperson of such sophisticated legal terminology. The explanations by both judges suffered from the employment by them of the very words being explained. "A definition should be clearer than the term being defined: its terms must be better known than the term in question, and without obscurity or AMBIGUITY; a definition should thus avoid repeating the term being defined. 'Truth is the quality of being true' is not a useful definition." (Lazarus et al., Modern English (1971) p. 87, emphasis in original.) Thus, the explanation of the meaning of "conflict of interest," on each occasion recited by the majority, failed to inform defendant Noday of the nature of the fundamental constitutional right he was being asked to waive. Further, defendant Noday was never informed that waiver of conflict-free counsel would preclude him from raising the issue of the consequences of ineffective assistance of counsel resulting from the joint representation, either on appeal or by collateral attack on the judgment. Since Noday was inadequately apprised of the right to separate counsel and the consequences of any waiver of that right, his waiver should be held to be ineffective. (*People* v. *Douglas, supra,* 61 Cal.2d 430, 435.)

Under the Rules of Professional Conduct of the State Bar, an attorney may not represent conflicting interests without the written, informed consent of all concerned parties (rule 5-102(B), Rules Prof. Conduct of State Bar); such consent is essential in all cases where there is a possibility that confidential information obtained from one client may relate to the representation of another client whose interests con-

flict with that client from whom confidential information has been obtained. (Rule 4-101, Rules Prof. Conduct of State Bar.)

In *Holloway* v. *Arkansas* (1978) 435 U.S. 475 [55 L.Ed.2d 426, 98 S.Ct. 1173], the United States Supreme Court observed, "Joint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing. For example, in this case it may well have precluded defense counsel for Campbell from exploring possible plea negotiations and the possibility of an agreement to testify for the prosecution, provided a lesser charge or a favorable sentencing recommendation would be acceptable. Generally speaking, a conflict may also prevent an attorney from challenging the admission of evidence prejudicial to one client but perhaps favorable to another, or from arguing at the sentencing hearing the relative involvement and culpability of his clients in order to minimize the culpability of one by emphasizing that of another. . . . The mere physical presence of an attorney does not fulfill the Sixth Amendment guarantee when the advocate's conflicting obligations have effectively sealed his lips on crucial matters." (*Id.*, at pp. 489-490 [55 L.Ed.2d at p. 438].)

The majority asserts that there is no *Pope* error (see *People* v. *Pope* (1979) 23 Cal.3d 412 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1]) because defendant doesn't set forth what the exculpatory testimony of Noday and Smart would have been. In my view, *Pope* error does exist because due to the inadequate advice of counsel regarding the existence of, or potential for, a conflict of interest, defendant was induced to waive a fundamental constitutional right—the right to conflict-free counsel. Under *Cuyler* v. *Sullivan* (1980) 446 U.S. 335 [64 L.Ed.2d 333, 100 S.Ct. 1708], however, *Pope* is not, I believe, controlling.

In *Cuyler* v. *Sullivan, supra*, 446 U.S. 335, 348 [64 L.Ed.2d 333, 346], the United States Supreme Court held that if a defendant does not object at trial to multiple representation, on a petition for a writ of habeas corpus the defendant must demonstrate that an actual conflict of interest occurred which adversely affected his trial lawyer's performance. Under *Cuyler* v. *Sullivan*, once a petitioner has shown that a conflict of interest adversely affected the adequacy of his trial lawyer's performance, it is unnecessary that he demonstrate prejudice. (*Id.*, at pp. 349-350 [64 L.Ed.2d at p. 348].) The United States Supreme Court reaffirmed in *Cuyler* that ". . . unconstitutional multiple representation is *never harmless error.*" (*Id.*, at p. 349 [64 L.Ed.2d at p. 347], italics added.)

In the present case, it is clear that an actual conflict of interest adversely affected the performance of Noday's trial lawyer. The refusal of Noday's attorney to permit defendant Noday to testify in his own defense, although he had a fundamental right to so testify (*People* v. *Robles* (1970) 2 Cal.3d 205, 215 [85 Cal.Rptr. 166, 466 P.2d 710]), was the result of an actual conflict of interest. This is apparent from Gillis' statement in his declaration that he convinced Noday not to testify because he was afraid that defendant Noday would incriminate his other client, Maldonado. After Gillis refused to permit Noday to testify and elected not to call Smart as a witness because of the representation by Smart's attorney that his client would decline to testify based on the Fifth Amendment, he rested without the presentation of a defense for Noday. Attorney Gillis' omissions are illustrative of the problem noted in the *Holloway* court's observation that "[j]oint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing." (*Holloway* v. *Arkansas, supra*, 435 U.S. 475, 489-490 [55 L.Ed.2d 426, 438].)

The majority holds that defendant Noday is precluded from claiming he was ineffectively represented "... except, possibly, with respect to actual conflict or evidence of ineffective assistance of counsel which was unrelated to the fact of multiple representation." Majority opn., *ante*, p. 520.) Not only is this assertion unsupported by authority, but, in my opinion, it begs the question. The record discloses that defendant Noday was told by his attorney, Gillis, that there was no conflict. This, in and of itself, was ineffective assistance of counsel. Since at the time of the second waiver proceeding, Attorney Gillis still had not discussed with codefendant Maldonado what facts she knew or whether she would testify, and he had not reviewed discovery made available by the district attorney's office which indicated that Noday had spoken to a government agent about Maldonado, it was impossible for him adequately to assess whether a conflict of interest would develop that would preclude adequate representation of both Noday and codefendant Maldonado at trial. He was, therefore, unable ethically to advise his clients to continue with the joint representation and to waive their right to separate counsel.

A defendant is certainly entitled to the effective assistance of counsel in deciding whether to waive the right to independent counsel. Such an election occurs at a most critical stage of a criminal proceeding. A defendant who purportedly waived his right to conflict-free counsel cannot thereby be precluded from contending that he lacked the effective assis-

tance of counsel at the time he needed that counsel perhaps the most: when making the decision to waive that fundamental constitutional right. It seems clear to me that this lack of effective or even honest assistance of counsel in making this crucial decision would vitiate the waiver even had it been effectively made in the first instance.

The majority states that this ineffective assistance of counsel was cured by the court's interrogation of the defendant at the two waiver hearings. At the first waiver hearing, there was no inquiry whether the conflict of interest problem had been discussed with counsel. At the second waiver hearing, when Judge Parker asked Noday and Maldonado whether they had talked with Attorney Gillis about the possibility of a conflict of interest, Maldonado replied, "I have not talked with him at all, except what we talked about out in the corridor," and Noday was silent. The court then replied, "Well, Mr. Gillis is of the opinion that there is no conflict of interest between the two of you, and he has so stated." I find it difficult to conceive how such a statement by the court could cure counsel's misrepresentation. The court's statement served rather to reinforce the misapprehension of defendant Noday concerning the existence of a conflict.

Most of the problems arising out of joint representation could be avoided by the simple expedient of forbidding joint representation of defendants in felony matters, or, in the alternative, requiring severance of the trials of jointly represented defendants. I strongly urge that such a remedial rule be established by the Supreme Court or the Legislature.

I would grant the writ.

A petition for a rehearing was denied December 7, 1981, and the opinion was modified to read as printed above. Dalsimer, J., was of the opinion that the petition should be granted. Petitioner's application for a hearing by the Supreme Court was denied January 20, 1982. Bird, C. J., was of the opinion that the application should be granted.

---

APPENDIX A

(Not to Be Published)

[Crim. No. 30387. Second Dist., Div. One. Feb. 17, 1978.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD RALPH NODAY, Defendant and Appellant.

---

APPEAL from a judgment of the Superior Court of Los Angeles County. Kathleen Parker, Judge. Affirmed.

Stephen S. Gillis and John DeNora for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Frederick R. Millar, Jr., and Alexander W. Kirkpatrick, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

HANSON, J.—

### INTRODUCTION

Ronald Ralph Noday was found guilty, pursuant to a jury verdict, of conspiracy to commit grand theft and conspiracies to cheat and defraud (Pen. Code, §§ 182, subd. 1, 487, subd. 1, 182, subd. 4); conspiracy to commit murder (Pen. Code, §§ 182, subd. 1, 187); attempted grand theft (Pen. Code, §§ 664/487, subd. 1) and two counts of grand theft (Pen. Code, § 182, subd. 1). Defendant appeals only his conviction for conspiracy to commit murder.

### THE FACTS[1]

In January 1976 defendant Noday was approached by Richard Allen for help in obtaining the financing for Allen's proposed acquisition of a car dealership. Defendant Noday told Allen that he was currently negotiating for the purchase of a bank in San Diego and that he would be able to make Allen a loan when that transaction was complete. Meanwhile, defendant Noday said the financing for the bank purchased was being held up, and he needed cash to be placed in one of his business accounts to satisfy Security Pacific Bank's loan requirements. Noday stated that he needed between $50,000 and $100,000 in order to complete the bank acquisition.

Allen told defendant Noday that he knew of a possible source for the money. Allen thereafter contacted Harold Porter who owned a business in Lancaster which he had recently sold for $100,000. Porter agreed to permit Allen to use the money as collateral for a business loan only if its safe return could be guaranteed. Noday had arranged that the money should be held at Reliance Escrow Company which he was purchasing. Allen was able to satisfy Porter by investigating and learning from informed sources that the escrow company enjoyed an excellent reputation for honesty. Accordingly, Porter and Allen on January 5, 1976, met with codefendant Steve Jones, an executive in the escrow company and an associate of Noday's, and agreed upon terms to open an escrow. Porter was to have complete control over the escrow, 10 percent interest in advance, and receive the return of his money in 90 days. Porter gave Jones $100,000 in the form of a cashier's check and was given a receipt and a copy of the escrow instructions. Jones told Porter that the money would be deposited in an escrow account in Security Pacific National Bank and he handed Porter $2,500 in cash representing advance interest.

On January 12, 1976, defendant Noday telephoned Porter to inform him that a stolen check had been deposited in Reliance Escrow Company's account and that "they were going to be investigated." Defendant Noday requested that Porter draw the money out of the escrow account and give it to him taking a personal note, but Porter refused. After speaking with investigators from Security Pacific National Bank, Porter called Jones and told him that he wished to withdraw his funds from the escrow ac-

---

[1]Defendant appeals only as to his conviction of conspiracracty to commit murder and consequently the statement of the facts does not include reference to the evidence adduced on the other counts except insofar as relevant to the conspiracy to commit murder. William Beverly Smart and Steven Duane Jones were charged as codefendants as to certain counts but trials were severed. Consuelo Maldonado was charged as a codefendant on charges of conspiracy and grand theft only and was acquitted.

count, but Jones said that Reliance had loaned these funds to defendant Noday. Porter thereupon demanded his money back from defendant Noday who said that Porter could have it "at any time." Porter demanded the return of the money that afternoon. Although defendant Noday verbally agreed to this demand, he failed to return the funds.

On January 13, 1976, defendant Noday told Porter that he (defendant) would return the money the next day in San Diego at the International Plaza Hotel. Porter and Allen went to San Diego, went to the hotel coffee shop at 10 a.m. and waited but defendant Noday did not appear. Finally, Allen received a telephone call at 1 p.m. from Bev. Smart. Mr. Smart informed Allen that defendant Noday was in Chicago trying to get money to buy the bank but he would return that night. Mr. Smart offered to help Porter and Allen obtain the return of the $100,000 but their attempt was unsuccessful.

On January 18, 1976, defendant Noday and Mr. Smart met with Porter and defendant again offered to give Porter a personal note for the money but Porter refused. Mr. Smart then assured Porter that in any event the matter would be "cleared up" within 72 hours. Later that night Porter received a telephone call from a man who identified himself as "Charlie Summers," said he was aware of Porter's dealings with defendant Noday and asked Porter to meet him at the Delta Airlines terminal at Los Angeles Airport. Porter and Allen went to the Delta terminal and waited two hours but Summers did not arrive.

Porter heard from Summers on four or five other occasions; Summers offered to help Porter retrieve his money from defendant Noday for a fee of $6,000, which Porter declined. Porter never received the return of any part of his $100,000.

Meanwhile, on January 9, 1976, George Pelham had entered into an agreement with defendant Noday to kill Harold Porter.[2] On that day Pelham met defendant Noday at the Holiday Inn in Long Beach. Defendant Noday explained to Pelham that he had taken $100,000 from Porter and if Porter were not killed, it would create legal problems for defendant. Defendant Noday offered Pelham $10,000 for the murder, plus $1,000 for arranging the "contract," and $500 for expenses. Defendant Noday wanted the murder to be accomplished by Sunday, January 11, 1976, but Pelham told defendant that the murder could not be carried out so promptly.

Subsequently, Pelham telephoned defendant Noday and told him that a friend had arrived to assist in the murder. Pelham asked defendant Noday to provide a gun, and defendant said: "I think it's okay about 45 till," from which Pelham inferred that he would provide a .45 caliber pistol. That evening, Pelham and Bobby Haber met with defendant Noday and Jones. After some discussion defendant gave Pelham $10,000 in $100 bills but said that he was unable to locate a firearm. Pelham said he would secure the gun. Defendant then told Pelham that he had arranged for Porter to be at the International Plaza Hotel in San Diego the following morning at 10 a.m.

Pelham and Haber, unarmed, traveled to San Diego and stayed overnight at a hotel near the International. The following morning, the two ate breakfast at the International Plaza Hotel's coffee shop where they saw Porter whom they identified from the description given Pelham by defendant Noday. They overheard Porter ask the desk to page him if there were any messages for him from defendant Noday.

Pelham left the coffee shop with Haber and they discussed the best way to get the defendant's $10,000 without hurting anyone. Pelham called defendant Noday around 11 a.m. and told him that the timing and layout for the killing had been wrong. Pelham informed defendant that he would return $7,000 but that he had given $3,000 to his friend for expenses. Defendant told Pelham that if they wished to earn the other $7,000 they could "string out" the situation for a few days.

---

[2]Pelham testified at trial under a grant of immunity from prosecution.

Two days later Pelham called defendant and told him that the murder would be accomplished. In fact, it had been Pelham who had earlier telephoned Porter using the name "Charlie Summers," and arranged for Porter to meet him at the Delta Airlines terminal in Los Angeles. Pelham testified that this was done so that Porter would not be home if defendant tried to verify whether Porter was still alive. Pelham then reported the homicide to defendant Noday who met with and gave him $7,000 in addition to the money he had already received or a total of $11,500.

Pelham fled Los Angeles to Las Vegas where he later learned that defendant Noday was angry to find Porter still alive and had placed a "contract" on him (Pelham) with two other men. Pelham went to New Orleans where he stayed for about a month. Pelham spoke with both defendant Noday and Jones on the telephone while in New Orleans and they asked him to return the money, but Pelham refused. While in New Orleans, Pelham, again using the name "Charlie Summers," on several occasions called Porter and offered for a fee to help secure the return of Porter's money from defendant Noday. Porter would not agree to this proposition.

In February 1976 Pelham returned from New Orleans to "make peace" with defendant Noday and Jones. In late March Pelham met with defendant because there were no "hard feelings." Prior to that meeting Pelham had talked with the FBI about the case, and consented to allow the FBI to tape telephone conversations between himself and defendant Noday. Calls were recorded on April 6, 7, 8, and 9, 1976. During a telephone conversation on April 8, 1976, defendant Noday asked Pelham to murder Dave Powers and Mark Coffman, government witnesses in a federal prosecution against defendant. Defendant Noday offered to pay Pelham $50,000 for the two murders less the $11,500 that he had already received.

Thereafter defendant Noday was arrested at the American Airlines terminal at Los Angeles Airport when he gave Pelham $38,500 in $100 bills, wrapped in newspaper. Defendant Noday did not testify at his trial and no defense was offered as to the charge of conspiracy to commit murder.

### ISSUES

Defendant Noday contends that: (1) the trial court erred in not instructing the jury that prosecution witness George Pelham was an accomplice as a matter of law; (2) Pelham's uncorroborated statements were improperly admitted into evidence; (3) the transcript and taped conversation between defendant and Pelham were improperly admitted into evidence; (4) hearsay declarations of an alleged coconspirator (Jones) were improperly admitted into evidence; and (5) the admissible evidence was insufficient to establish the corpus delicti of a conspiracy to commit murder.

### DISCUSSION

### I

Defendant first contends that the trial court erred in not instructing the jury *sua sponte* that principal prosecution witness Pelham was an accomplice as a matter of law.

California Penal Code section 1111 defines an accomplice "as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." Our determination as to whether Pelham was in fact an accomplice focuses on the substantive crime as to which defendant Noday appeals his conviction; that is, conspiracy to commit murder. Defendant Noday contends Pelham became an accomplice as a matter of law by accepting the money which rendered him liable for prosecution for the same offense.

Criminal conspiracy is a combination of two or more people acting in concert with an unlawful purpose, accompanied by an overt activity in furtherance of the objects of the agreement. (*People v. Frankfort* (1952) 114 Cal.App.2d 680, 688 [251 P.2d 401];

*Otash* v. *Bureau of Private Investigators* (1964) 230 Cal.App.2d 568, 573 [41 Cal.Rptr. 263]; cf. Perkins, Criminal Law (1969) p. 614.) Furthermore, criminal conspiracy is a specific intent crime. The specific intent required divides logically into two elements: (a) the intent to agree, or conspire, and (b) the intent to commit the offense which is the object of the conspiracy. (*People* v. *Horn* (1974) 12 Cal.3d 290, 296 [115 Cal.Rptr. 516, 524 P.2d 1300].)

The evidence of the case at bench is less than clear as to whether Pelham had at the time he entered the original agreement with defendant Noday formed the specific intent necessary to find him guilty of conspiracy to commit murder. While there is circumstantial evidence to suggest that at the time of Pelham's agreement with Noday for the murder of Porter, Pelham may have intended to commit the murder, it may also be inferred that Pelham never actually intended to kill Porter but to defraud Noday. Pelham testified that he discussed with Haber the best way to get Noday's money for the contract "without hurting anyone." Moreover, when asked why he took the money from Noday, Pelham responded that: "Nobody else makes any money but him. And I figured he had it coming." It may be inferred that these thoughts were in Pelham's mind when he verbally accepted Noday's offer.

An instruction that a witness is an accomplice as a matter of law is required only if undisputed evidence establishes the complicity of the witness. (*People* v. *Duncan* (1960) 53 Cal.2d 803, 816 [3 Cal.Rptr. 351, 350 P.2d 103]; *People* v. *Davis* (1954) 43 Cal.2d 661, 672 [276 P.2d 801].) To fail to give such an instruction where the undisputed evidence shows that the witness entered into the conspiracy constitutes error. (*People* v. *Bowman* (1966) 240 Cal.App.2d 358, 288 [49 Cal.Rptr. 772].) Conversely, where the evidence is conflicting, it is for the trial court to instruct the jury that the witness is an accomplice as a matter of law since that would usurp the jury's function of determining the factual issue of whether the witness entered the conspiracy. (*People* v. *Manson* (1977) 71 Cal.App.3d 1, 35 [139 Cal.Rptr. 275].) Where there is conflicting evidence as to whether a witness is an accomplice, the issue must be submitted to the jury. (*People* v. *Gordon* (1973) 10 Cal.3d 460, 467 [110 Cal.Rptr. 906, 516 P.2d 298]; *People* v. *Manson* (1977) *supra*, 71 Cal.App.3d 1.) Under the circumstances of this case, it was proper for the trial court to instruct the jury in accomplice testimony[3] and leave the determination of the witness' complicity up to them. Hence, defendant's contention that the trial court abused its discretion in not instructing the jury that Pelham was an accomplice as a matter of law is without merit.

## II

Defendant's second contention is that the statements of Pelham as an alleged accomplice were improperly admitted into evidence without corroboration. (Pen. Code, § 1111.) This contention is predicated on defendant's assumption that Pelham was an accomplice as a matter of law. Since we have determined that issue adversely to defendant Noday, his testimony was admissible and it became the function of the jury to determine its weight and credibility. In any event the most significant aspects of his testimony were corroborated. Porter testified that defendant said he had "borrowed" the

---

[3]The jury was instructed to accomplice testimony by the trial court using California Jury Instructions Criminal (CALJIC) No. 3.10 (accomplice-defined), CALJIC No. 3.11 (testimony of accomplice must be corroborated), CALJIC No. 3.12 (sufficiency of evidence to corroborate an accomplice), CALJIC No. 3.13 (one accomplice may not corroborate another), CALJIC No. 3.14 (criminal intent necessary to make one an accomplice), CALJIC No. 3.18 (testimony of accomplice to be viewed with distrust), and CALJIC No. 3.19 (burden to prove corroborating witness in an accomplice).

These instructions properly framed the issue for the jury and allowed for inferences either way as to Pelham's testimony.

$100,000 placed in escrow; Pelham stated defendant told him he had swindled Porter's money; and Louise Jones testified that she became aware of the swindle because the escrow company's books were manipulated. Pelham's testimony about going to the hotel in San Diego to find Porter and later calling him as "Charlie Summers" were corroborated by Porter. The payment of the $38,500 from Noday to Pelham at the airport was corroborated by the agent who recovered that money. Moreover, the taped conversation evidenced the offer made by defendant Noday to pay Pelham for the murder. The declarations of coconspirator Jones were also admissible to corroborate defendant's offer to pay for murder. (*People v. Manson, supra,* p. 36.) "The corroborating evidence must do more than raise a conjecture or suspicion of guilt, but it need not be direct, nor extend to every detail of the accomplice's testimony or to every element of the crime. It may be circumstantial, and is sufficient, even though slight and entitled to little weight when standing alone, if it tends in some degree to implicate the defendant in such a way as reasonably may satisfy the trier of fact that the accomplice is telling the truth." (*People v. Randono* (1973) 32 Cal.App.3d 164, 173 [108 Cal.Rptr. 326].) Hence, even if the jury found Pelham to be an accomplice, sufficient corroboration sustains the judgment.

### III

Defendant's third contention is that a tape recording and transcript of a telephone conversation between defendant and Pelham recorded by the FBI during the week of April 6-9, 1976, were improperly admitted into evidence.

Defendant Noday bases this contention principally on the fact that a taped recording is a writing (Evid. Code, § 250) which requires a proper foundation. (Evid. Code, §§ 1400, 1401.) Defendant alleges that as an accomplice, Pelham's testimony could not have properly been used to lay the foundation. Although Pelham was not an accomplice as a matter of law, his testimony would be admissible to lay the foundation for the tape recording even if he was found by the jury to be an accomplice. (See, e.g., *People v. Patton* (1977) 63 Cal.App.3d 211 [133 Cal.Rptr. 533]; *People v. Bowley* (1963) 59 Cal.2d 855 [31 Cal.Rptr. 471, 382 P.2d 591, 96 A.L.R.2d 1178].)

Defendant further argues that the tape was inadmissible because the recorded statements constituted hearsay.[4] However, defendant's hearsay admissions of guilt, which were his own statements and not supplied by another witness or coconspirator, constitute a recognized exception to the hearsay rule. (Evid. Code, § 1220.) Defendant claims that section 1223 of the Evidence Code, dealing with admissions of coconspirator, limits Evidence Code section 1220 and that admissions of a defendant constitute competent evidence only when such admissions are in furtherance of a conspiracy. The effect would be that no postconspiratorial admission of a defendant could be considered. This interpretation would prevent the purpose of Evidence Code section 1220 which is to allow into evidence *any* admission of complicity by a defendant. In any event, defendant Noday's own admissions were competent evidence even if the conspiracy had ended prior to the time they were made. (See *People v. Leach* (1975) 15 Cal.3d 419, 445 [124 Cal.Rptr. 752, 541 P.2d 296].)

### IV

Defendant's fourth contention is that hearsay declarations of an alleged coconspirator, Steven Jones, were improperly admitted into evidence.

Defendant Noday objects to the admission into evidence of the testimony of David Powers who stated that in March, 1976, Steven Jones told him that "[w]e put the contract out on Harold Porter." Defendant argues that the admission was not within the

---

[4]Only a brief portion of one tape recording was played for the jury. The balance of the tape recordings were excluded from evidence.

parameter of the coconspirator admissions exception to the hearsay rule. (Evid. Code, § 1223.)

Three preliminary facts must be established before the declaration of a coconspirator is admissible: (1) that the declarant was participating in a conspiracy at the time of the declaration; (2) that at the time of the declaration the party against whom the evidence is offered was participating or would later participate in the conspiracy; and (3) that the declaration was in furtherance of the objective of the conspiracy. (Evid. Code, § 1223, *People* v. *Leach, supra*, pp. 419, 430-431, fn. 10.)

Defendant points out that the indictment charged him with the Harold Porter murder conspiracy between January 1, 1976 and February 28, 1976. Defendant contends that since the conversation between Powers and Jones took place in March, 1976, its admission into evidence was not proper because the criminal activity terminated by March and consequently the conversation was not in its furtherance.

However, the reasonable inference from the evidence is that there existed an underlying conspiracy to do away with those who could implicate defendant Noday and his coconspirators for their continuing schemes. This statement was made during the pendancy and in the furtherance of that conspiracy which was of longer duration. That conspiracy continued because defendant Noday, after learning Porter was still alive, hired two other men to kill his former coconspirator, Pelham. David Powers, who was pleased when these arrangements were made, supplied corroborating testimony as to this fact.

Assuming that such an underlying conspiracy existed, the question then is whether the statement made by Jones falls within the coconspirators' exception to the hearsay rule (Evid. Code, § 1223). Since it appears Jones was participating in the conspiracy at the time of the declaration, the first requirement is met, and the second requirement of independent evidence of defendant's complicity at the time of the declaration is met for the reason above stated. This third requirement that the statement be in furtherance of the conspiracy can be met by the content of the declaration. (*People* v. *Leach, supra*, 15 Cal.3d 419.)

The testimony relative to the conversation Jones engaged in with David Powers suggests that a continuing conspiracy to kill those who could supply evidence against them or expose their criminal activities existed. Defendant Noday, Jones, Ron Rossie and an unidentified person were present when Rossie told defendant that people were angry at him (Noday) because he had put out a contract to kill someone. Defendant replied that he had given money to Pelham for this purpose but he had decided not to do it and "split" with the money. Rossie, or the person with him, then offered to give Noday "two jobs for the price of one" from which it may be inferred that he would kill both Porter and Pelham. Defendant agreed to think about it. Then in late February or early March, 1976, Powers had a conversation with Jones at the request of the FBI in an attempt to ascertain the name of the person he and Noday had attempted to have killed. Jones told Powers they had put the contract on Porter.

The argument of defendant is that the conspiracy ended when Pelham absconded with the money. However, there was substantial evidence of a continuing conspiracy which supported the admission of Powers' testimony as to Jones' statements. "It has long been the law in this state that a conspirator's statements are admissible against his coconspirator only when made during the conspiracy and in furtherance thereof. [Citations]. The conspiracy usually comes to an end when the substantive crime for which the coconspirators are being tried is either attained or defeated. [Citations.] It is for the trier of fact—considering the unique circumstances and the nature and purpose of the conspiracy of each case—to determine precisely when the conspiracy has ended. [Citations.] Particular circumstances may well disclose a situation where the conspiracy will be deemed to have extended beyond the substantive crime to activities

contemplated and undertaken by the conspirators in pursuance of the objectives of the conspiracy. [Citations.]" (*People* v. *Saling* (1972) 7 Cal.3d 844, 852 [103 Cal.Rptr. 698, 500 P.2d 610].) There was no abuse of discretion by the trial court in admitting this testimony.

## V

Defendant's fifth contention is that there was insufficient admissible evidence to prove the corpus delicti of conspiracy. The corpus delicti of a crime must be established prior to admission into evidence of extrajudicial statements or admissions of a defendant. (*People* v. *Grimes* (1949) 91 Cal.App.2d 629 [20 P.2d 416].)

Defendant predicates his attack on the assumption that if Pelham were found to be an accomplice as a matter of law, his testimony could not have established the corpus delicti of the crime without corroboration. This assumption is erroneous: an accomplice's testimony to establish the corpus delicti need not be corroborated. (*People* v. *Scofield* (1971) 17 Cal.App.3d 1018 [95 Cal.Rptr. 405].) Only the defendant's connection with the crime requires corroboration. (*People* v. *Buono* (1961) 191 Cal.App.2d 203 [12 Cal.Rptr. 604].) Pelham's testimony clearly established a conspiracy and he was not an accomplice as a matter of law; hence, the trial court committed no abuse of discretion in admitting his testimony. Therefore, the defendant's contention as to the insufficiency of the corpus delicti of the crime conspiracy fails.

## DISPOSITION

The judgment appealed from is affirmed.

Lillie, Acting P. J., and Thompson, J., concurred.