Filed 8/2/13  P. v. Sandoval CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B237068 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. BA371228) |
| ERNIE SANDOVAL, | |
| Defendant and Appellant. | |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Frederick N. Wapner, Judge.  Affirmed.

        Karlin & Karlin and Marc A. Karlin for Defendant and Appellant.

        Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr., and Rama R. Maline, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Ernie Sandoval was convicted by a jury of the second degree murder of Melvin Estrada, with the finding that he intentionally discharged a firearm, which caused great bodily injury and death to the victim. (Pen. Code, §§ 187, subd. (a), 12022.53, subd. (d).)[1] Defendant admitted he had suffered a prior serious felony conviction within the meaning of sections 667, subdivision (a), 667, subdivisions (b) through (i), and 1170.12, subdivisions (a) through (d). He was sentenced to an indeterminate prison term of 60 years to life. He appeals, contending that the evidence was insufficient to support his conviction, he did not receive effective assistance of counsel, his new trial motion should have been granted, and his sentence is unconstitutionally excessive. We reject each contention and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

On July 14, 2007, at approximately 3:18 a.m., Melvin Estrada was shot from behind near the corner of Whittier Boulevard and 19th Street in Montebello. Estrada was pronounced dead at the scene seven minutes later, at 3:25 a.m.

On October 5, 2010, defendant was charged by information with the first degree murder of Estrada in violation of section 187, subdivision (a). The information further charged that defendant used a firearm in the commission of the murder and that defendant had suffered a prior conviction of a serious or violent felony.

An 11-day jury trial followed, during which the following evidence was introduced.

### I. Prosecution Case

#### A. *Candice Ruiz*

Ruiz testified that she had been involved romantically with the victim, Melvin Estrada. She was with him when he was shot and killed on July 14, 2007.

---

[1] All further statutory references are to the Penal Code.

Ruiz stated that she spent the evening of July 13, 2007, with her friend, Reyna De Luna, who was then dating defendant. Ruiz said she and De Luna drank a six-pack of beer in Ruiz's car and then drove to Universal CityWalk to celebrate Ruiz's birthday. Ruiz and De Luna went to the Rumba Room, where they danced and continued to drink. After several hours, they left the Rumba Room to meet Estrada. Although she was "pretty drunk," Ruiz drove with De Luna to a Burger King restaurant on the corner of Highland and Hollywood, continuing to drink beer on the way. Once in the Burger King parking lot, Ruiz saw Estrada and several of his friends. She and De Luna got out of the car and drank more beer with Estrada and his friends.

Sometime later, Ruiz, De Luna, and Estrada decided to leave the parking lot and go home. Estrada wanted Ruiz to drive De Luna to her apartment in Montebello and then go home with him. The three left in Ruiz's car. As they drove towards De Luna's apartment, Ruiz's cell phone rang. Estrada grabbed the phone and asked who was calling her at that hour. De Luna told Estrada to give Ruiz her phone back. Estrada said no, he wanted to find out who was calling. De Luna then turned around and tried to grab the phone, but Estrada would not return it. De Luna and Estrada struggled over the phone.

Ruiz got off the freeway in Montebello and drove towards De Luna's apartment. De Luna said she wanted to get out of the car and walk home; as soon as Ruiz stopped the car, both De Luna and Estrada exited and began to walk in different directions. Ruiz followed De Luna and persuaded her to get back in the car. Ruiz then dropped De Luna off at her apartment and went to look for Estrada. She found him by an Arco gas station on Whittier Boulevard in Montebello. She tried to pull him back into her car, but he resisted. His shirt came off during the struggle.

When Estrada refused to get into her car, Ruiz began to follow him. After about a block, Estrada stopped walking and leaned into Ruiz's car through the passenger side front window. As he did so, Ruiz heard a loud popping sound. Estrada walked around the front of the car and, when Ruiz opened her door, Estrada fell to the ground, bleeding from his mouth. Ruiz yelled loudly for help, and several people stopped and tried to lend

3

assistance.  Ruiz called the Montebello police station and 911.  It took the police "[a] long time" to arrive on the scene.

Before she heard the gunshot, Ruiz did not hear anyone other than Estrada and she did not see anyone near her vehicle.  After the gunshot, she saw a man walking away.  She saw only the man's back, white t-shirt, and short hair, from a distance of about 40 feet.  She did not see a gun.  She does not know who shot Estrada.

After the police arrived, they took Ruiz to the Montebello police station where she was interviewed by Detectives Labbe and Rodriguez.  During a subsequent interview, she told the detectives that De Luna had used her cell phone during the ride from Burger King to Montebello on July 14, 2007.  Afterwards, her phone rang and displayed a number with a 562 area code.  Ruiz answered the phone and heard a male voice.  The man seemed upset and asked, "Where are you?"  Before Ruiz could hang up the phone, De Luna said it was "Ernie" and spoke to him.

Prior to July 14, 2007, Ruiz had met defendant once or twice through De Luna.  Ruiz knew De Luna and defendant were dating.  Ruiz believed that defendant had been in her car once, a couple of months earlier.  Ruiz did not know defendant's phone number and had never called defendant.  To her knowledge, defendant had never called her.


B.      *Reyna De Luna*

1.      Direct Examination

De Luna testified pursuant to a grant of immunity.  She said she and Ruiz had been friends since middle school and remained friends until about 2009.  De Luna met defendant in 2006 through defendant's sister, Vanessa Sandoval.  Defendant and De Luna began dating right away.  De Luna met Estrada for the first time the night he was shot and killed.  To her knowledge, defendant never met Estrada.

De Luna testified that on the evening of July 13, 2007, she and Ruiz went out drinking at the Rumba Room.  They drank on the way to the Rumba Room and continued drinking once they got there.  They left the Rumba Room when it closed, at 1:45 or 2:00 a.m.  De Luna was very drunk when she and Ruiz left the Rumba Room, and she

4

does not recall much about what happened afterwards. De Luna and Ruiz drove to a Burger King in Hollywood to pick up Estrada. When they arrived, Estrada was there with a group of his friends. At some point, De Luna, Ruiz, and Estrada left and drove towards Montebello. Ruiz and Estrada argued; he took her phone, and then she got it back. De Luna said something to Estrada and then made a motion with her hand; Estrada pulled her arm back, and De Luna hit him in the nose a couple of times with her other hand. Estrada's face began to bleed. Estrada wiped the blood off his face and put it on De Luna's face, and she fought him off. As a result of the fight with Estrada, De Luna's knuckles were bruised and her neck was scratched.

De Luna said that while driving from Burger King to her home, she did not use Ruiz's cell phone and she did not recall Ruiz receiving any phone calls. She did not call defendant during the car ride.

After fighting with Estrada, De Luna got out of Ruiz's car on Whittier Boulevard. Estrada also got out of the car and Ruiz "went chasing him." Ruiz pulled on Estrada's shirt; he took off his shirt and kept walking. De Luna planned to call someone to pick her up, but she did not call anyone. She then got back in the car with Ruiz, who drove her home. The last time she saw Estrada, he was walking on Whittier Boulevard towards East Los Angeles.

After Ruiz dropped her off at home, De Luna washed her hands and face. Then, "I don't remember how but — or if [defendant] called me, but [defendant] was outside, and so I went outside." She got into defendant's car and defendant asked what had happened. At first, De Luna "said nothing, and then after I told him that I punched the guy." Defendant said, "I heard you fighting." De Luna said, "[I]t's nothing. I hit the guy," and she showed him her swollen knuckles. De Luna did not want defendant to know she and Estrada had been fighting.

Defendant and De Luna drove to a dirt lot on the corner of Whittier Boulevard and 19th Street. De Luna could not recall what she and defendant talked about as they drove or how defendant knew to drive to that location. When they got to the dirt lot, De Luna saw Ruiz's car on Whittier Boulevard near the dirt lot. She did not recall seeing anyone

5

standing outside the car or in the dirt lot, and she did not know why defendant stopped in the dirt lot. Defendant parked, got out of the car, and walked towards Whittier Boulevard. De Luna did not see where he went. Defendant was gone for less than a minute, during which time De Luna heard a "pop . . . [l]ike a firework." De Luna thought the sound might have been a gunshot. When defendant returned to the car, she asked him what had happened. He said, "Nothing, let's go," or "Shut up. Let's go." De Luna did not see a gun.

Defendant drove with De Luna to his aunt and uncle's house in Anaheim. After they got there, defendant's sister, Vanessa, drove De Luna back to her apartment in Montebello. At trial, De Luna testified that during the ride, she told Vanessa only about the fight with Estrada. She was impeached with her preliminary hearing testimony that Vanessa asked, "Well, what happened. What did he do? And I told her, I don't know. And she asked if he shot him." De Luna answered, "I don't — I don't know. I think so." Vanessa seemed surprised and cried.

The morning after Estrada's murder, De Luna received a call from the Montebello Police Department and was asked to go in to the station to answer questions. Vanessa drove De Luna to the station. De Luna was interviewed by a police officer, but she did not tell the officers everything "'[c]ause I didn't think he [defendant] had done anything wrong." When De Luna left the police station, Vanessa was outside, waiting for her.

Nearly three years after Estrada's murder, on May 6, 2010, De Luna was arrested and charged with first degree murder. On May 9, 2010, while in jail, De Luna gave a recorded statement to the police, which was played for the jury at trial. In that statement, De Luna said after she was interviewed by Montebello police the morning after Estrada's murder, defendant or Vanessa picked her up and drove her to Victorville. De Luna's children were with defendant's aunt. Defendant asked De Luna what she told the police, and she said she told the police, "I didn't know nothing." Defendant then asked what Ruiz told the police and threatened to kill her. De Luna told defendant that Ruiz "wasn't going to say anything. She's my friend. Just leave it alone." Defendant told De Luna that she better not say anything because he knew where her mom and kids were and he

6

would hurt them if she spoke to the police. When he said that, defendant was "scary serious." Defendant then had Vanessa bring De Luna's children to Victorville, where they all stayed for several days. During that time, defendant controlled De Luna's movements. De Luna was afraid defendant "was going to do something to us . . . kill one of my kids, or anything." De Luna told the detectives that when defendant "has a temper, it's scary." She said he once tried to kill her.

After she was interviewed by police in jail on May 9, 2010, De Luna was released. De Luna later was granted immunity for her testimony.

At trial, De Luna said she never heard defendant threaten to kill Ruiz. She agreed, however, that on May 9, 2010, she had told police defendant had asked whether Ruiz had told the police anything and threatened to kill her. De Luna also testified at trial that she was not afraid of defendant and that defendant never threatened her. However, she admitted that she had told police she was afraid of defendant and his family. She also admitted testifying at the preliminary hearing that she was afraid of defendant, and that defendant told her "that I better not say anything" because "he knows where my mom and my kids are."

2.     Cross-examination

During cross-examination, De Luna testified that when Detective Labbe interviewed her on May 9, 2010, he told her she was never going to see her children again because she was in for murder. He said that if she told him what he wanted to hear, he personally would take her home. De Luna said she would have told Detective Labbe anything to get home to her children. Detective Labbe spent a couple of hours with her, going over her story three times before recording it. Detectives Labbe and Carrillo drove De Luna home late in the afternoon of May 9, telling her that she would have to continue to cooperate or she would end up back in jail. She felt afraid because she did not want to go back to jail. De Luna said she was terrified of Detective Labbe.

De Luna said that before she testified at the preliminary hearing, Detective Labbe handed her a transcript of the May 9 interview and said "this is my statement that I had to

7

say" and if she did not, she would go back to jail. Her testimony at the preliminary hearing was consistent with her May 9 statement because she did not want to go back to jail.

De Luna said she did not see Estrada after he got out of Ruiz's car to walk home the night of the murder, and she did not have any contact with Ruiz after Ruiz brought her home. Thus, De Luna could not have known where Estrada or Ruiz were at 3:18 a.m. on the night of the murder. De Luna said she did not tell defendant that Estrada got out of Ruiz's car at the corner of Whittier and Montebello Boulevard, she did not see Ruiz's car near the dirt lot where defendant parked, and she did not see where defendant went after he exited the car. De Luna did not see defendant carrying a gun when he exited the car and she did not see defendant open the trunk after he exited the car. She did not see him carrying a gun when he returned to the car and she did not smell gunpowder. De Luna did not know why she and defendant went to the dirt lot at 19th and Whittier on July 14.

De Luna said it was not true that defendant had threatened her or her family or that she was afraid of defendant or his family. She continued a relationship with defendant after Estrada's murder. De Luna said she has never seen defendant with a gun, either on the night of the murder or at any other time.


### C.    *Jody Citizen*

Citizen works for Verizon Wireless. He testified that along Interstate 5 from Anaheim up through Montebello, the cell phone towers have signal strength of about two to three miles.

Citizen was shown cell phone records for Sylvia Sanchez, whom both counsel stipulated is defendant's mother. Counsel further stipulated that the cell phone number on Sanchez's phone bill ending with 8901 belonged to defendant and the cell phone number ending with 7106 belonged to Vanessa Sandoval.

Sanchez's phone records reflect the following calls made during the early morning hours of July 14, 2007:

8

At 2:55 a.m., a call was made from (909) 993-7022 (identified by a subsequent witness as Ruiz's phone) to defendant's phone. It lasted 52 seconds. The call was transmitted through a cell tower in Anaheim.

At 2:56 a.m., a call was made from Ruiz's phone to defendant's phone and went into voicemail. The call was transmitted through a cell tower in Anaheim. Also at 2:56 a.m., a call was made from defendant's phone to Ruiz's phone.

At 3:04 a.m., a call was made from defendant's phone to (626) 456-2029 (identified by a subsequent witness as De Luna's phone) and lasted slightly more than four minutes.

At 3:05 a.m., a call was made from Ruiz's phone to defendant's phone. It lasted 24 seconds and went into voicemail. The call was transmitted through a cell tower in Downey.

At 3:09 a.m., a call was made from defendant's phone to De Luna's phone. It lasted 24 seconds. It was transmitted through a cell tower in Pico Rivera.

At 3:13 a.m., a call was made from defendant's phone to an unidentified number. The call was transmitted through a cell tower in Montebello.

At 3:15 a.m., a call was made from defendant's phone to Ruiz's phone. The call was transmitted through a cell tower in Montebello.

At 3:21 a.m., a call was made from defendant's phone to Ruiz's phone. The call was transmitted through a cell tower in Montebello.

### D.    Raymond MacDonald

MacDonald is a manager with T-Mobile. He testified regarding phone records for subscriber number (909) 993-7022. Candice Ruiz was the account holder for that phone number. The records show that on July 14, 2007, at 2:54 a.m., two calls were made from Ruiz's phone to (562) 322-7106, identified as defendant's phone. At 2:54, a call was made from Ruiz's phone to (562) 322-8901, identified as Vanessa Sandoval's phone. At 3:20 a.m., a call was made from Ruiz's phone to (323) 887-1313, identified by a later witness as the Montebello Police Department, and lasted three minutes. If another call

9

had come in to Ruiz's phone during this time and went directly into voicemail, it would not appear on these records.

E.    *Solomon Riley, Jr.*

Dr. Riley is a deputy medical examiner for the Los Angeles County coroner's office. He performed an autopsy on Melvin Estrada on July 17, 2007. He observed that Estrada had suffered a single gunshot entry wound to the upper back, as well as some blunt force injuries, a contusion near his eyelid, and several abrasions. Dr. Riley concluded that Estrada died as a result of the single gunshot wound. Based on blood and urine samples collected during the autopsy, Dr. Riley concluded at the time of his death, Estrada's heart blood alcohol level was .28 percent, his femoral blood alcohol level was .26 percent, and Estrada had ingested marijuana and cocaine.

F.    *Edward Dixon*

Dixon works for AT&T. He testified regarding subscriber phone records for phone number (626) 456-2029, issued to Reyna De Luna. On July 14, 2007, at 3:05 a.m., De Luna's phone sent or received a text message. At 3:17 a.m., the phone received a call from a mobile phone, which was transmitted through a cell tower in Montebello. At 3:20 a.m., the phone received a call from an (818) number, which was carried by a cell tower in Montebello.

On July 14, 2007, at 1:30 p.m., a call was made from De Luna's phone, which was carried by a cell tower in Pico Rivera. At 2:11 p.m., De Luna's phone received a call carried by a cell tower in Chino. At 2:39 p.m., De Luna's phone received a text message carried by a cell tower in Adelanto, California. For the next 24 hours, all of De Luna's cell phone calls were routed through the same cell tower in Adelanto.

G.    *Daniel Morris*

Morris is a Los Angeles Sheriff's Department Detective. He was involved in investigating the shooting death of Melvin Estrada. In connection with that investigation,

10

he and his partner, Detective Gustavo Carrillo, interviewed Reyna De Luna on May 10, 2010, at the Montebello Police Department. Detective Labbe was not present for that interview. The purposes of the interview were to show De Luna a video and to have her sign witness relocation paperwork. De Luna had some concerns for her safety, but seemed to be in good spirits. She did not appear apprehensive about the meeting, nor did she express any apprehension or ill feelings towards Detective Labbe. De Luna was relocated a few weeks after the meeting. Several months later, she called and asked if she could move.

### H.    Ty Labbe

Detective Labbe is a homicide detective with the Los Angeles County Sheriff's Department. He and his partner, Detective Martin Rodriguez, investigated the shooting death of Melvin Estrada. When Detective Labbe arrived at the crime scene about an hour after the shooting, the driver's window and front passenger's window of Ruiz's car were down and there was blood spatter on the interior of the roof of the car. There was blood in the street near the victim's body. Detective Labbe did not recover any shell casings. The shell recovered from the victim's body during an autopsy was a .22 short, which can be fired from a semiautomatic handgun or a revolver.

Detective Labbe interviewed Ruiz the morning of July 14, 2007. Her cell phone call history showed that she had called 911 at 3:18 a.m. It also showed that she had received calls from defendant's cell phone at 3:09 and 3:15 a.m. Ruiz said she did not recognize defendant's phone number. Ruiz told Detective Labbe that De Luna and Estrada had fought during the drive to De Luna's apartment earlier that morning. Ruiz's phone had rung repeatedly; she answered it once and heard a male voice that sounded upset. After Ruiz dropped De Luna off at her apartment, Ruiz went back to look for Estrada. She eventually saw him walking on the street and convinced him to come to her passenger side window. While Estrada was leaning against the window, she heard loud pops and then saw Estrada stagger in front of her car. He continued to stagger and then collapsed at her driver's door. Ruiz got out of her car and called for help. As she did so,

she saw a male Hispanic with broad shoulders and short hair and wearing a white t-shirt walking away from the back of her car in the direction of the dirt lot. Ruiz could not recall whether she saw any cars in the lot. Ruiz subsequently told Detective Labbe that her phone rang while she, De Luna, and Estrada were driving on the 60 Freeway the night of Estrada's murder; the caller was male, but Ruiz did not recognize his voice. The male caller appeared to be upset and said, "Where are you?" Ruiz was going to hang up the phone, but De Luna took it from her and spoke to the caller, addressing him as "Ernest."

Detective Labbe interviewed De Luna the same day. He observed that she had fresh bruises and cuts on the tops of her hands. De Luna said that while riding in Ruiz's car, she and Estrada had fought over a cell phone. During the fight, Estrada pulled her hair and scratched her wrist, and De Luna punched Estrada twice in the face. De Luna said she and Estrada were both bleeding as a result of the fight, and she had some of Estrada's blood on her forehead. De Luna said that she did not leave her apartment after Ruiz dropped her off the morning of the murder.

Detective Labbe next interviewed De Luna in April 2010. He showed De Luna a composite drawing depicting defendant and asked whether she recognized the person depicted in the drawing. De Luna said she did not recognize him, but she immediately began trembling and crying. Detective Labbe told De Luna he believed she was present when Estrada was killed, and he showed her a projected route of travel based on her cell phone records that depicted her leaving her house, traveling to the crime scene, and then traveling to Anaheim. De Luna still did not admit to leaving her apartment after Ruiz dropped her off the night of the murder.

Detective Labbe interviewed De Luna again two weeks later, on April 25, 2010. During that interview, De Luna admitted leaving her apartment after Ruiz dropped her off the morning of the murder. She also admitted seeing defendant at her apartment, but she did not admit going to the murder scene with him.

De Luna was arrested on May 6, 2010. Detective Labbe interviewed her at the detention facility three days later, on May 9, 2010. During that interview, De Luna's demeanor was entirely different than it had been in the past. She appeared to be fully

12

cooperative and said she wanted to go home to her kids. She said she was afraid of defendant and his family, and she related an incident where defendant had held a knife to her throat and threatened to cut off her hair.

Using phone company records, Detective Labbe constructed a travel pattern for each cell phone that he analyzed. The records indicated as follows:

De Luna's phone was in the Universal City area on July 14, 2007, between 12:15 a.m. and 1:22 a.m. At about 2:19 a.m., the phone left Universal City and traveled to near Hollywood Boulevard and Highland Avenue. Between about 2:53 a.m. and 3:05 a.m., De Luna's phone traveled east on the 60 Freeway, ending in Montebello. At 3:17 a.m., De Luna's phone called Ruiz's phone; that call was carried by a tower about three-quarters of a mile from the crime scene.

Ruiz's phone made two calls to defendant's phone, at 2:55 a.m. and 2:56 a.m. Fifteen seconds later, at 2:56 a.m., defendant's phone made a 32-second call to Ruiz's phone. After that time, defendant's cell phone traveled north, from Anaheim towards the crime scene, in about 13 minutes. Defendant's cell phone called De Luna's cell phone at 3:05 a.m. and 3:09 a.m.; both defendant's cell phone and De Luna's cell phone were communicating with the cell tower nearest De Luna's residence in Montebello. Between 3:13 a.m. and 3:21 a.m., defendant's phone made 10 calls transmitted by a tower 1.3 miles from the crime scene. Between 3:21 a.m. and 3:26 a.m., defendant's phone made no calls. After 3:26 a.m., defendant's cell phone left the area of the crime scene, traveled north towards Pico Rivera, and then south towards the tower near defendant's home in Anaheim, arriving in Anaheim by 4:24 a.m. At 5:01 a.m., defendant's phone began traveling towards the City of Upland, arriving in Upland at 5:52 a.m. Defendant's phone then continued north into the City of Adelanto/Victorville at 10:13 a.m.

Phone records indicate that Vanessa Sandoval's phone was near De Luna's residence at 4:37 a.m., near defendant's residence at 5:03 a.m., and then back near De Luna's residence by 6:04 a.m. Vanessa's phone then traveled from the Pico Rivera corridor at 1:41 p.m., through the San Gabriel Valley, up to the Interstate 215/15 corridor, arriving in Adelanto by 4:11 p.m.

13

There was no activity on De Luna's phone between 4:23 a.m. and 6:19 a.m. the morning of Estrada's murder. De Luna's phone arrived in Adelanto at about the same time Vanessa Sandoval's phone did.

## II.     Defense Case

The defense called a single witness, Francisco Cruz. Cruz testified that he was looking for a parking spot near Whittier and 19th Street at about 3:15 a.m. on July 14, 2007. He saw two cars, a black SUV and a black compact car, in a dirt lot. The lot was dark. After circling the block once, he returned to the same location and the cars were gone. A car was on Whittier Boulevard, west of 19th Street, parked near a curb. A girl was in the street crying and a guy was lying on the ground. The girl did not say anything to Cruz. At some point, she handed her cell phone to Cruz and he started talking to the 911 operator. He told the police there was a guy who came from the compact car and went into the passenger side of the SUV, and then he went back inside the car and left. The man was Hispanic, bald, and was wearing a white muscle shirt. Cruz did not see anything in the man's hands.

## III.     Conviction, Sentence, and Appeal

On February 22, 2011, the jury returned a verdict finding defendant guilty of the second degree murder of Melvin Estrada and finding that defendant personally and intentionally discharged a firearm causing great bodily injury and death to Estrada. Later, on July 12, 2011, defendant admitted he had suffered a prior serious felony conviction.

Defendant filed a motion for new trial on the grounds of insufficiency of the evidence, admission of prejudicial evidence, and ineffective assistance of counsel. The trial court denied the motion in its entirety.

On September 16, 2011, the court sentenced defendant to 60 years to life, calculated as follows: 15 years to life on count one (§ 187, subd. (a)), doubled pursuant to section 1170.12, subdivisions (a)-(d), and 667, subdivisions (b)-(i), for a total of 30

14

years to life, plus an additional five years pursuant to section 667, subdivision (a), plus an additional 25 years to life pursuant to section 12022.53, subdivision (d).   Defendant timely appealed.

**DISCUSSION**

Defendant contends:  (1) the evidence was insufficient as a matter of law to support the murder conviction; (2) he did not receive effective assistance of counsel; (3) the motion for new trial should have been granted; and (4) the sentence imposed violates the Eighth Amendment's prohibition against cruel and  unusual punishment.  We consider these issues below.

## I.      Sufficiency of the Evidence

Defendant contends the evidence was legally insufficient to support the conviction of second degree murder—i.e., "'the unlawful killing of a human being with malice aforethought . . . .' [Citation.]" (*People v. Beltran* (2013) 56 Cal.4th 935, 942.) Specifically, defendant asserts that no physical evidence linked him to the crime, Ruiz and De Luna were too intoxicated the night of the murder to clearly recall the events to which they testified, there were no eyewitnesses to the shooting, De Luna was intimidated and coerced by Detective Labbe, and the cell phone evidence did not conclusively place defendant at the crime scene at the time of the murder.  For the reasons that follow, we reject defendant's contentions and conclude that the evidence was sufficient to support the conviction.

In determining the sufficiency of the evidence to support a criminal conviction, "'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.]" (*People v. Latham* (2012) 203 Cal.App.4th 319, 326.)  """"[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—

that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" [Citation.] The same standard of review applies to cases in which the prosecution relies mainly on circumstantial evidence [citation], and to special circumstance allegations [citation]. An appellate court must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]' (*People v. Maury* (2003) 30 Cal.4th 342, 396.)" (*People v. Elliot* (2005) 37 Cal.4th 453, 466.)

In the present case, there was substantial evidence placing defendant and his girlfriend, De Luna, at the crime scene at the time of the murder. De Luna testified that immediately after defendant arrived in Montebello shortly after 3:00 a.m., he drove her to a dirt lot at the corner of Whittier Boulevard and 19th Street, immediately adjacent to the location where Estrada was shot. De Luna said that from the dirt lot, she could see Ruiz's car—the very same car Estrada was leaning against when he was shot—on Whittier Boulevard. De Luna testified that after stopping the car in the dirt lot, defendant got out of the car and walked towards Whittier Boulevard. Defendant was gone for less than a minute, during which time De Luna heard a "pop . . . [l]ike a firework," that she thought might have been a gunshot. She did not see anyone else in the dirt lot. When defendant returned to the car, she asked what had happened. He said, "Nothing, let's go," or "Shut up. Let's go."

De Luna's testimony was corroborated by defendant's cell phone records, which showed defendant making and receiving calls transmitted by a cell tower 1.3 miles from the murder scene immediately before and after the murder. No calls were made from defendant's phone between 3:21 a.m. and 3:26 a.m., approximately the time Estrada was shot. Finally, defendant's cell phone records showed that in the minutes after Estrada was shot, defendant left Montebello and traveled back to Anaheim, arriving there by 4:24 a.m.

The evidence at trial also established that defendant had a motive for shooting Estrada—namely, that Estrada had fought with defendant's girlfriend, De Luna. Both Ruiz and De Luna testified that Estrada and De Luna fought over a cell phone while

16

riding in Ruiz's car from Hollywood to Montebello approximately an hour before the murder. De Luna additionally testified that during the fight, Estrada suffered a bloody nose and she suffered bruised knuckles and a scratched neck. By the end of the fight, both Estrada and De Luna had been spattered with Estrada's blood. There also was evidence that defendant heard at least a portion of the fight: Cell phone records showed three phone calls between Ruiz's phone and defendant's phone between 2:55 a.m. and 2:56 a.m., and De Luna testified that when defendant arrived at her apartment, defendant asked what had happened and said, "I heard you fighting." And, there was evidence from which the jury could have concluded that the fight between De Luna and Estrada angered defendant. Defendant's cell phone records showed that immediately after placing a call to Ruiz's phone at 2:56 a.m., defendant left Anaheim and began traveling rapidly towards Montebello. He arrived in Montebello approximately 13 minutes later, as evidenced by cell phone records that showed calls from defendant's cell phone carried by a Montebello cell tower near De Luna's apartment at 3:05 and 3:09 a.m.

Finally, the evidence at trial suggested that defendant threatened two key witnesses in the days following the murder. De Luna told the police that on July 14, 2007, defendant threatened to kill Ruiz and to hurt De Luna's mother and children if either woman said anything to the police. De Luna described defendant's demeanor when he made that threat as "scary serious." She also told police that defendant had a "scary" temper and had once tried to kill her.

Taken together, the foregoing is more than substantial evidence to support defendant's conviction of second degree murder.

## II. Ineffective Assistance of Counsel

Defendant contends he received ineffective assistance of counsel because his attorney presented no witnesses on his behalf, failed to conduct an investigation for exculpatory or alibi evidence, did not retain any experts, and "apparently did not conduct an investigation of the crime scene for any witnesses, physical evidence or other video evidence." For the following reasons, we reject defendant's claim.

17

"'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 694; *People v. Ledesma* (1987) 43 Cal.3d 171, 217.) A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel. (*Strickland v. Washington*, *supra*, at p. 687; *In re Andrews* (2002) 28 Cal.4th 1234, 1253.) If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.) Otherwise, the claim is more appropriately raised in a petition for writ of habeas corpus. (*Id*. at pp. 266-267.)' (*People v. Carter* (2003) 30 Cal.4th 1166, 1211; see also *People v. Cunningham* (2001) 25 Cal.4th 926, 1003 [same]; *People v. Mitcham* (1992) 1 Cal.4th 1027, 1059 ['The decisions whether to waive opening statement and whether to put on witnesses are matters of trial tactics and strategy which a reviewing court generally may not second-guess.'].)" (*People v. Carter* (2005) 36 Cal.4th 1114, 1189.)

Although an attorney may be deemed incompetent for failing to adequately investigate, in the present case there is no evidence that defense counsel failed to conduct a constitutionally adequate investigation. Because defendant presented no declaration of counsel, we have no information concerning what, if any, investigation counsel might have undertaken or what witnesses he might have interviewed. All that we can determine on the present record is that defense counsel called just one witness—but that does not require us to conclude that counsel did not undertake an appropriate investigation. To the contrary, the case put on by defense counsel is equally consistent with the conclusion that

18

counsel conducted an investigation and interviewed witnesses, but that such investigation failed to yield any exculpatory evidence or witnesses who could have provided testimony helpful to the defense.

Further, "'[t]o sustain a claim of inadequate representation by reason of failure to call a witness, there must be a showing from which it can be determined whether the testimony of the alleged additional defense witness was material, necessary, or admissible, or that defense counsel did not exercise proper judgment in failing to call him.'" (*In re Noday* (1981) 125 Cal.App.3d 507, 522, quoting *People v. Hill* (1969) 70 Cal.2d 678, 690-691.) In other words, where a defendant alleges incompetent investigation or presentation of evidence by trial counsel, he or she must demonstrate that the overlooked evidence would have been exculpatory in some fashion. (*In re Noday*, *supra*, at p. 522.) Put another way, the defendant "must show us what the trial would have been like, had he been competently represented, so we can compare that with the trial that actually occurred and determine whether it is reasonably probable that the result would have been different." (*In re Fields* (1990) 51 Cal.3d 1063, 1071; accord, *In re Hardy* (2007) 41 Cal.4th 977, 1025.) In the present case, defendant has not made any such showing—indeed, the record is completely silent as to what witnesses he believes his counsel should have called and what testimony he believes those witnesses would have provided. In short, the record before us does not support defendant's claim of ineffective assistance of counsel.

### III.    Motion for a New Trial

Defendant contends the trial court should have granted his motion for a new trial because the evidence was not sufficient to support the jury's guilty verdict. Because we have already concluded that the jury's verdict was well supported by the evidence (Discussion, part I, *ante*), we need not further address this claim.

19

**IV. Defendant's Sentence Does Not Violate the Eighth Amendment's Prohibition Against Cruel and Unusual Punishment**

Defendant contends finally that his 60 years to life sentence violates the "cruel and usual punishment" clause of the Eighth Amendment to the United States Constitution. For the following reasons, we do not agree.

"'Cruel and unusual punishment is prohibited by the Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution. Punishment is cruel and unusual if it is so disproportionate to the crime committed that it shocks the conscience and offends fundamental notions of human dignity.' (*People v. Mantanez* (2002) 98 Cal.App.4th 354, 358, fns. omitted.) "'A tripartite test has been established to determine whether a penalty offends the prohibition against cruel . . . [or] unusual punishment. First, courts examine the nature of the offense and the offender, 'with particular regard to the degree of danger both present to society.' Second, a comparison is made of the challenged penalty with those imposed in the same jurisdiction for more serious crimes. Third, the challenged penalty is compared with those imposed for the same offense in other jurisdictions. [Citations.] In undertaking this three-part analysis, we consider the 'totality of the circumstances' surrounding the commission of the offense. [Citations.]" [Citation.]' (*People v. Chacon* (1995) 37 Cal.App.4th 52, 63; see also *People v. Thongvilay* (1998) 62 Cal.App.4th 71, 87-88.)

"""Whether a particular punishment is disproportionate to the offense is, of course, a question of degree. The choice of fitting and proper penalties is not an exact science, but a legislative skill involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors, and responsiveness to the public will; in appropriate cases, some leeway for experimentation may also be permissible. The judiciary, accordingly, should not interfere in this process unless a statute prescribes a penalty 'out of all proportion to the offense' [citations], i.e., so severe in relation to the crime as to violate the prohibition against cruel or unusual punishment." [Citation.]' (*People v. Lewis* (1993) 21 Cal.App.4th 243, 251.) "'Only when the punishment is out of all proportion to the offense and is clearly an extraordinary penalty

for a crime of ordinary gravity committed under ordinary circumstances, do the courts denounce it as unusual." [Citation.]' (*Ibid.*)

". . . 'Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment.' (*People v. Martinez*, *supra*, 76 Cal.App.4th 489, 496; see also *People v. Mantanez*, *supra*, 98 Cal.App.4th 354, 358.)

"In our examination of '"the nature of the offense" prong' of the cruel and unusual punishment test, we 'consider not only the offense in the abstract—i.e., as defined by the Legislature—but also "the facts of the crime in question." [Citation.] This entails an examination of the totality of the circumstances surrounding the commission of the offense in the case at bar, including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts.' (*People v. Thompson*, *supra*, 24 Cal.App.4th 299, 305; see also *People v. Estrada* (1997) 57 Cal.App.4th 1270, 1278.) To assess the nature of the offender, we look at defendant's 'individual culpability in light of his age, prior criminality, personal characteristics, and state of mind.' (*People v. Crooks* (1997) 55 Cal.App.4th 797, 806.)" (*People v. Rhodes* (2005) 126 Cal.App.4th 1374, 1389-1390.)

In the present case, we are not persuaded that defendant's sentence is cruel or unusual in light of the seriousness of his crime. Viewed in the light most favorable to the conviction, defendant committed an execution-style murder, apparently in retaliation for a fight the victim had with defendant's girlfriend over a cell phone. During that fight, defendant's girlfriend suffered only minor cuts and bruises, apparently as a result of blows she inflicted on the victim, not injuries he inflicted on her. Defendant knew almost nothing about the circumstances or severity of the fight—the only information he appears to have had was what he overheard during a phone call and his girlfriend's statement to him that, "It's nothing. I hit the guy." Defendant's response to this apparent provocation was to track down the victim, approach him from behind, and shoot him in the back, leaving him to die on the street. Under the egregious circumstances of this case, we do not consider the penalty of 60 years to life in prison so disproportionate to the gravity of

the offense as to constitute cruel and unusual punishment, and defendant has made no showing that the challenged penalty is far in excess of that imposed in California for less serious crimes or for the same offense in other jurisdictions.

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

SUZUKAWA, J.

We concur:

WILLHITE, Acting P. J.

MANELLA, J.