Filed 3/23/22  P. v. Brooks CA1/1
Opinion following transfer from Supreme Court

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br>　　　Plaintiff and Respondent,<br>v.<br>MARCEL BROOKS,<br>　　　Defendant and Appellant. | A159421<br><br>(Alameda County<br>Super. Ct. No. 17-CR-012133A) |

A jury convicted appellant Marcel Brooks of conspiracy to commit murder and attempted murder of his 11-month-old son.  On appeal, Brooks argued that the trial court abused its discretion by (1) denying his two motions to replace his appointed attorney; (2) admitting jail letters from Brooks to his co-conspirator Andanna Ibe that contained sexually explicit statements; and (3) admitting a police sergeant's testimony related to song lyrics contained in another jail letter from Brooks to Ibe.  We rejected those claims in our original opinion.

The California Supreme Court granted review and transferred the matter back to us with directions to vacate our decision and reconsider the cause in light of Assembly Bill No. 518 (2021–2022 Reg Sess.) (Stats. 2021,

1

ch. 441, § 1) (Assembly Bill No. 518), which recently amended Penal Code section 654[1] to afford trial courts discretion to impose a lesser sentence.

We conclude the trial court did not abuse its discretion but find that remand for resentencing is warranted to allow the trial court to exercise its new sentencing discretion under section 654. Accordingly, we remand for resentencing, and in all other respects we affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Brooks was charged by second amended information with conspiracy to commit premeditated murder (§§ 182, subd. (a)(1), 187, subd. (a)) (count 1); attempted murder of his son and Asala Odom—the mother of his son—on April 4, 2017 (*id.* §§ 187, subd. (a), 664, subd. (a)) (counts 2 & 3); and attempted murder of his son on April 17, 2017 (count 4). Count 4 also included a special allegation that Ibe was armed with a firearm (§ 12022, subd. (a)(1)). Ibe was charged by the same information. Ibe had a five-year old child with Brooks and was pregnant with another child of his at the time of the charged offenses.

Odom testified at trial that she had applied for MediCal benefits in late 2016 and named Brooks as the father of her son who had been born in April. Alameda County subsequently sought child-support payments from Brooks. Brooks was upset and he believed the child was not his. After a DNA paternity test affirmed he was the father, Brooks's attitude changed but his interest in his son stopped around March 2017. That same month, Brooks was ordered to pay $523 a month in child support.

Brooks testified that he was initially resistant about being the father of Odom's son, but subsequently wanted to be more involved in his life. When Brooks was asked about his financial situation at that time, he responded

---

[1] All further statutory references are to the Penal Code.

that he had a "couple thousand" in the bank, which was more money than he had "ever had in [his] life."

### A. The April 4, 2017 Car Incident

Odom testified that Brooks initiated a meeting with her and their son on April 4, 2017, at the San Leandro BART station—the first time they had seen each other since the entry of the child-support order. Shortly before the set meeting time, Brooks sent Odom a text that he had "[j]ust got to MacArthur BART." Brooks, however, was in Antioch when he sent that text. Once Odom received the text, she left her house with their son. As she was walking, there was a car waiting for her to cross the street. When she passed in front of the car, it sped up and swerved towards her as she ran away. She described the car as a silver four-door and the driver as an African-American woman with long hair. Odom ran back into her house and subsequently contacted Brooks to ask whether he was at their meeting spot or still on his way. Brooks responded that he was no longer coming. Odom told Brooks what had happened to her, described the car and the driver, and expressed concern that it was connected to Brooks or someone he was dating. Brooks told Odom that she was "crazy" and that he did not have anything to do with it.

Brooks testified that he had lied about being at the MacArthur BART station when he sent the text because he was "stalling" and wanted to keep the meeting, but needed to find a babysitter for his other child. He did not know where in San Leandro Odom was living at the time. Odom told him that a "crazy driver" had almost hit her, but did not identify the type or color of the car.

Cell phone records showed that approximately 10 calls were made between Brooks and Ibe on April 4, 2017. Around noon, Brooks received a

3

call from Ibe that lasted 10 to 15 minutes. The records also showed that Ibe's phone traveled from Antioch to San Leandro shortly before noon, and then back to Antioch.

*B. The April 17, 2017 Shooting*

Odom testified that Brooks initiated another meeting with her and their son on April 17, 2017, at a McDonald's in San Leandro. Odom was not hesitant to go because they had met there on April 9 without incident.

Brooks testified that he drove Ibe in her car to the McDonald's because he wanted Ibe to meet Odom and their son, as Ibe did not believe Brooks had another child. He did not tell Odom about this plan. Brooks and Ibe arrived early but missed the turn, so parked on the street behind the McDonald's. Brooks got out and told Ibe that she should get some gas. He claimed he told her that because he wanted to "call another girl and not be in her presence." He was then on his phone for "20 minutes or more."

Surveillance video from the McDonald's showed Ibe entered the restaurant before Odom. Between 2:14 p.m. and 2:27 p.m., Brooks and Ibe made three calls to each other. At approximately 2:30 p.m., Brooks sent Odom text messages stating that he was "here" and "inside" the McDonald's. Odom replied that she had just walked in. Odom sat down at a table next to a window with her son. When Odom texted Brooks to ask where he was, Brooks texted that he was walking up. Ibe called Brooks at 2:31 p.m. and Brooks called Ibe at 2:35 p.m.

Odom testified that as she was waiting, someone approached and fired a shot that went through the window next to her table. It appeared that the gun was pointed at her son, but the shot missed. Surveillance video showed Ibe approaching Odom and her son, firing a single shot, and then exiting the restaurant.

4

Brooks testified that he had lied about being inside the McDonald's when he sent the text to Odom because he was "impatient" and did not like waiting. He said that when Brooks saw sirens coming from the McDonald's and Ibe's car gone, he thought that maybe Ibe and Odom had gotten into a fight or argument. He did not try to text or call Ibe or Odom because he was "waiting for one of them to call [him]." According to Brooks, Ibe had told him that she was "carrying protection in case this bitch tries to do anything," but he thought that "could have meant mace, or whatever." Brooks, however, had seen Ibe with a gun "a couple months before" the shooting.

Brooks testified that he then took a taxi to a nearby park to "collect [his] thoughts," and talked with friend Greg Frazier and coworker Brandon Starks on the phone. He asked Starks for a ride, and Starks dropped him off at a BART station in Oakland. Brooks then went to Brentwood where his car was located. He drove to Livermore, as Ibe texted him that she had been in a car accident there. Text messages recovered from Ibe's cell phone included a text sent to Brooks with the address of the accident location in Livermore. Brooks called a towing service and had them tow Ibe's car back to her friend's house. Records from Ibe's cell phone showed a text sent to Brooks with an address in Antioch. Brooks testified that he then drove Ibe towards El Dorado Hills because she wanted to go to her aunt's house. Ibe was unable to reach her aunt by phone, however, so Brooks and Ibe proceeded to Frazier's house in Sacramento because Frazier had invited Brooks to come talk. They stayed at Frazier's house for a while, but then went to a nearby motel because Ibe said she wanted to be alone. Brooks and Ibe were arrested at the motel.

Police attempted to extract text messages from Brooks's cell phone but none were recovered. Brooks testified that he had a practice of deleting all of

5

his text messages so that he would not "get caught cheating," as he was involved with different women.

### C. The Verdict and Sentencing

The jury found Brooks guilty on count 1 (conspiracy to commit premeditated murder) and count 4 (attempted murder of his son on April 17, 2017), but acquitted Brooks on counts 2 and 3 (the attempted murders on April 4, 2017). As to count 4, the jury also found true the special allegations that the attempted murder was willful, deliberate, and premeditated, and that Ibe was armed with a firearm. The trial court sentenced Brooks to 25 years to life in prison for conspiracy to commit premeditated murder, and stayed the sentences on the remaining count and enhancement.

## II. DISCUSSION

### A. The Trial Court Did Not Abuse Its Discretion in Denying Brooks's Marsden Motions

Brooks first argues that the trial court improperly denied his two motions to replace his appointed attorney under *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*). We review the denial of the *Marsden* motions for abuse of discretion. (*People v. Streeter* (2012) 54 Cal.4th 205, 230.)

#### 1. Additional Facts

Brooks made his first *Marsden* motion in October 2017, prior to trial. At the hearing on the motion, Brooks stated that he and his counsel had a disagreement in September 2017, where his counsel used profanity and also said: "Oh, you know if you go to trial, you know you're going to be going against an all-white jury." Brooks felt disrespected by the use of profanity and Brooks did not trust his counsel "because of that." Counsel agreed that they had had an argument because Brooks said he had done some research and "knew that if you shoot at somebody and you miss, there is no attempted murder." Counsel continued: "I tried to tell him that that is not the law, but

6

he was adamant that that was the law, and that was the argument. And I might have used some inappropriate words, but that's where we left off. He was totally convinced that that is the law, and I was – I couldn't convince him otherwise." Counsel noted that "if the Court could address the issue with Mr. Brooks, I'm sure that would be helpful for Mr. Brooks, at least on that issue." The trial court denied the *Marsden* motion. It also stated: "One specific thing I will address, since it was brought up, is shooting and missing. Technically, that is attempted murder and can be. . . . in Alameda County, it seems like many times attempted murder is not charged unless it's a shooting that hits someone. But that's not required in an attempted murder."

Brooks made his second *Marsden* motion in January 2020, after trial but before sentencing. Brooks argued that, among other things, his counsel (1) ignored a discovery violation by the prosecution in failing to provide text messages between Brooks and Ibe that were recovered from Ibe's phone; and (2) failed to locate and call Starks and Frazier as witnesses in the trial. At the hearing on the motion, Brooks explained that Starks could have testified about what Brooks had said while driving to the Oakland BART station, and Frazier could have testified that Brooks said he did not know what happened between Ibe and Odom, and that Brooks wasn't "fleeing" to Sacramento but had been invited by Frazier. Counsel stated that he did not have any knowledge about the texts. Counsel also stated that Starks could not be located at the time of trial and that any statements Brooks may have made to Frazier "might have been viewed as somewhat self-serving." When asked if he had an investigator on the case, counsel responded: "Initially I did. I don't recall. Like I say, most of these things didn't pan out, and I knew Mr. Brooks would be testifying on his own behalf." The trial court denied the *Marsden* motion. It explained that there was a hearsay problem with the

7

proposed testimony from Starks and Frazier, and that a purported discovery violation by the prosecution "may be grounds for something else," but was not a reason to excuse Brooks's counsel.

Brooks then moved to represent himself under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*). At the hearing on the motion, Brooks stated that he sought to investigate the purported discovery violation and a potential motion for new trial. Brooks explained that he had obtained text messages used during Ibe's trial from his family members, and they included messages between him and Ibe on the day of and day after the shooting that contained "nothing incriminating." The prosecution reviewed the text messages and explained that some (but not all) of Ibe's text messages had been recovered, and that those text messages had been provided to Brooks's counsel by disk. Brooks's counsel reviewed the text messages and stated that he had no present recollection of the specific disk, given the volume of discovery. The trial court also reviewed the text messages,[2] but ultimately denied the *Faretta* motion as untimely and proceeded with sentencing.

### 2. *Analysis*

When a defendant makes a *Marsden* motion, the trial court " ' "must permit the defendant to explain the basis of his contention and to relate specific instances of inadequate performance." ' " (*People v. Streeter, supra,* 54 Cal.4th at p. 230.) " ' "A defendant is entitled to relief if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable

---

[2] The text messages presented by Brooks at the hearing are not included in the record. It appears, however, that the trial court read two of the messages aloud during the *Faretta* hearing: (1) "It's CJ's birthday, and how could you be thinking of this" and (2) "I'm pregnant, and you think about that situation."

8

conflict that ineffective representation is likely to result." ' " (*Ibid*.)  Denial of a *Marsden* motion is not an abuse of discretion " ' "unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel." ' " (*Ibid*.)

As to the October 2017 pre-trial *Marsden* motion, Brooks argues that the trial court abused its discretion by failing to adequately inquire about his counsel's purported statement regarding the prospect of an "all-white jury." We are not persuaded.  The transcript of the *Marsden* hearing shows that Brooks recounted a disagreement from September 2017, during which his counsel used profanity and stated that if Brooks went to trial, he would be "going against an all-white jury."  Counsel explained the legal nature of their disagreement, and admitted that he "might have used some inappropriate words" in trying to convince Brooks of the law on attempted murder.  The trial court thus complied with its duty to permit Brooks to explain the basis of his contention, and ascertain the details of the specific disagreement he raised. (*People v. Streeter*, *supra*, 54 Cal.4th at p. 230.)  Moreover, the transcript reflects that Brooks's purported lack of trust in his trial counsel was based on his counsel's use of profanity during that argument.  Brooks stated:  "Your Honor, I feel like just the disrespect of someone cussing at me and using profanity, I've never disrespected Mr. Hong.  I've never cussed at him at all, and his disrespect for me rubbed me the wrong way.  And he cussed at me.  That's unprofessional."  The trial court did not abuse its discretion in concluding that Brooks had failed to demonstrate an irreconcilable conflict on this basis.  (See *People v. Hines* (1997) 15 Cal.4th 997, 1026 [concluding that asserted communication problems between defendant and counsel "were not insoluble and had not given rise to such an irreconcilable conflict that ineffective representation was likely to result"].)

As to the January 2020 post-trial *Marsden* motion, Brooks argues that the trial court abused its discretion because he raised multiple instances of deficient performance by his trial counsel. First, Brooks claims that his trial counsel failed to present to the jury "innocuous" text messages between Brooks and Ibe after the shooting that were recovered from Ibe's phone. Brooks contends that there is "no conceivable tactical basis for a reasonably competent attorney to fail to present these text messages after receiving them in the discovery from the prosecution." As a preliminary matter, the text messages are not included in the record; the trial court read aloud only two of the text messages at the *Faretta* hearing. This omission renders the record inadequate to review Brooks's claim as to the remainder of the text messages. (*People v. Whitus* (2012) 209 Cal.App.4th Supp. 1, 6 [appellant has " 'affirmative obligation to provide an adequate record so that we may assess whether the trial court abused its discretion' "].) As to the two text messages, Brooks's claim amounts to a "tactical disagreement" that is insufficient to demonstrate *Marsden* error. (*People v. Dickey* (2005) 35 Cal.4th 884, 922.) Contrary to Brooks's assertion, his trial counsel did not concede that he had failed to review the text messages during discovery. Instead, he stated at the *Marsden* hearing that he did not know about the text messages raised by Brooks, and then stated at the *Faretta* hearing that he had no present recollection of the specific discovery disk that contained the texts. Moreover, the two text messages were not necessarily as "innocuous" as Brooks suggests: in one, either Ibe or Brooks appears to express some concern by asking "how could you be thinking of this," and in the other Ibe appears to tell Brooks, "I'm pregnant, and you think about that situation." Brooks's trial counsel could have made a rational tactical choice to not present these text messages in order to avoid "opening the door to further incriminating

evidence." (*In re Alcox* (2006) 137 Cal.App.4th 657, 665.) This is particularly true because two *other* innocuous text messages between Ibe and Brooks sent after the shooting were admitted into evidence: one with the location of Ibe's car accident and the other with the address for towing her car. This evidence contradicted the inference suggested by the prosecution that Brooks had deleted all of his text messages because they were incriminating.

Second, Brooks claims that his trial counsel failed to locate and call Starks and Frazier as witnesses. " 'To sustain a claim of inadequate representation by reason of failure to call a witness, there must be a showing from which it can be determined whether the testimony of the alleged additional defense witness was material, necessary or admissible, or that defense counsel did not exercise proper judgment in failing to call [the witness].' " (*In re Noday* (1981) 125 Cal.App.3d 507, 522.) Although Brooks may have felt strongly about presenting these witnesses, as he claims on appeal, it simply does not follow that his attorney acted incompetently in declining to call them. Brooks concedes that any testimony from Starks or Frazier about what Brooks said when he was with them would be inadmissible hearsay. Moreover, any testimony from Starks confirming that Brooks was abandoned by Ibe in the McDonald's parking lot was not necessary, as there was no evidence or argument challenging Brooks's testimony on that fact and Ibe's text message to Brooks with the location of her car accident corroborated that they were not together after the shooting. Finally, any testimony from Frazier confirming he had invited Brooks to Sacramento was not material to the issue of whether Brooks fled the scene. As Brooks's testified, he left the McDonald's parking lot and went to a nearby park, then to an Oakland BART station, then to Brentwood, then drove to Livermore, then drove towards El Dorado Hills, then drove to Frazier's house

11

in Sacramento, and finally went to a motel. Brooks's testimony regarding an invitation to go to his *sixth* location after the shooting was not contradicted by any other evidence or argument, and was not necessary for Frazier to corroborate.

Third, Brooks claims that his trial counsel failed to hire an investigator for the case. While counsel's testimony at the *Marsden* hearing is unclear about whether or not he actually hired an investigator, Brooks argues that an investigator was critical here in order to locate Starks and Frazier so they could serve as witnesses. Given our conclusion that trial counsel did not act incompetently by failing to call these witnesses, we reject this argument for the same reasons.

In sum, we conclude that the trial court did not abuse its discretion in denying Brooks's *Marsden* motions.

B. *The Trial Court Did Not Abuse Its Discretion in Admitting Jail Letters*

Brooks argues that his convictions should be reversed because the trial court improperly admitted letters that Brooks sent from jail to Ibe. Specifically, he contends that the trial court should have redacted the "extremely lewd" sexually explicit statements in the letters under Evidence Code section 352. We review this evidentiary ruling for abuse of discretion. (*People v. Jones* (2017) 3 Cal.5th 583, 609.) " 'We will not reverse a court's ruling on such matters unless it is shown " 'the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*Ibid.*)

1. *Additional Facts*

A technician with the county sheriff testified that she had monitored Brooks's mail at the county jail. She observed that Brooks and Ibe had used intermediaries outside the jail to try to send letters to each other. Six of

12

these letters were seized during a search of Ibe's jail cell. Brooks testified that he wrote each of the letters and mailed them to family or friends with the intent that they would then be mailed to Ibe. Brooks also testified that Ibe had been kicked out by her family when they started dating, and that Ibe was "obsessed" with and "possessive" of him. Ibe was called by the prosecution to testify as a witness, but refused to answer any questions even with the grant of use immunity under section 1324.

Defense counsel objected to admission of these letters into evidence on the ground that Brooks was not cross-examined with regard to the specific sentences in the letters. The trial court overruled the objection and admitted the letters into evidence. The letters included, among other things, declarations from Brooks that he loved Ibe, wanted to be a family with her and marry her, and would never leave her. The letters also included graphic details of Brooks's desire to have sex with Ibe.

After the jury had begun its deliberations, defense counsel stated that he wanted to "add a 352 objection" because there was "a lot of sexual content to those letters that I think are more prejudicial than probative." Defense counsel also argued that the letters "are quite cumulative and repetitive." The trial court overruled the objections. It found that Brooks's personal relationship with Ibe was "inextricably intertwined with this case" and the prosecution's theory that Brooks was "manipulating [Ibe] psychologically" to commit the crime, cover it up, and refuse to cooperate. It also found that the chronology of the letters was relevant to this theory, as their contents "became more and more provocative" as the case got closer to trial.

### 2. Analysis

Evidence Code section 352 vests the trial court with discretion to exclude otherwise relevant evidence if "its probative value is substantially

outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Here, Brooks argues that the trial court abused this discretion by failing to redact the sexually explicit statements because the remaining portions of the letters "provided abundant support for the prosecution's theory of psychological manipulation." In other words, Brooks claims that the sexually explicit statements in the letters "did not add any *additional* probative value."

We are not persuaded. As the trial court found, Brooks's relationship with Ibe was "inextricably intertwined with this case." The prosecution argued that Brooks had conspired with Ibe to murder his son so that he could avoid making child-support payments, and was able to exploit Ibe and convince her to shoot the child. Nor are we persuaded that the sexually explicit statements had no relevance because they were cumulative of other statements in the letter. "Evidence may be relevant even though it is cumulative; thus, the only ban on cumulative evidence is found in Evidence Code section 352." (*In re Romeo C.* (1995) 33 Cal.App.4th 1838, 1843.) The letters to Ibe—including both the romantic *and* sexual proclamations by Brooks—bore directly on the nature of their relationship and Brooks's purported ability to manipulate Ibe into committing the shooting and then refusing to testify in his case.

Brooks also argues that any probative value was outweighed by its prejudicial impact because there was "a very serious risk that those obscene statements would deeply offend one or more of the jurors." Again, we are unconvinced. "The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence."

14

(*People v. Karis* (1988) 46 Cal.3d 612, 638.)  Instead, such prejudice arises from evidence that " 'uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " (*Ibid.*)  As described above, Brooks's writings to Ibe had a significant effect on key issues in this case, which outweighed the potential risk that the jury would be offended by their explicitly sexual nature.  We also consider the broader context of the evidence when determining its potential for prejudice. (*People v. Ortiz* (2003) 109 Cal.App.4th 104, 118.)  Here, the sexually explicit statements in the letters were far less inflammatory than the testimony concerning the charged offenses—involving the attempted murder of an 11-month old child and his mother—making it " 'unlikely . . . that the jury's passions were inflamed' " by the statements.  (*Ibid.*)

We thus conclude that the trial court did not abuse its discretion in admitting the letters.  Given our conclusion, we need not address Brooks's arguments that (1) the erroneous admission violated his due process rights, and (2) the error was prejudicial.

### C. *The Trial Court Did Not Abuse Its Discretion in Admitting Police Sergeant Testimony Regarding a Jail Letter*

Brooks argues that the trial court also abused its discretion by allowing improper opinion testimony by a police sergeant regarding the contents of one of the jail letters written by Brooks.

### 1. *Additional Facts*

Police sergeant Steve Cesaretti testified that during his investigation of the case, he had reviewed a May 2017 letter sent by Brooks.  Brooks testified that he had written the letter to Ibe because he had seen her on a transport bus from jail to court and was "trying to uplift her and give me hope."

Cesaretti testified that the letter referenced a song that he was personally familiar with.  When Cesaretti was asked why the lyrics as

15

written in the letter caught his attention, defense counsel objected on relevance. The trial court overruled the objection. Cesaretti answered that the lyrics were not from the real song, but instead "appeared to be directly related to the details of the case" and "directing Ms. Ibe to say certain things." The letter described lyrics from the perspective of the male rapper, but then directed Ibe to "Flip the whole song." Cesaretti testified that he had previously looked for codes in monitored jail mail as part of his "criminal street gang-related training." He stated that it was "fairly common" that an instruction to "flip" the song meant to change the pronoun from "he" to "she." Brooks testified that his letter did not contain the true song lyrics and that when he wrote to "flip the whole song," he meant to flip the pronouns from "he" to "she" and that the "she" referred to Ibe.

### 2. Analysis

Brooks argues that Cesaretti's testimony about the meaning of Brooks's letter was improper opinion testimony. Brooks admits, however, that his trial counsel objected to Cesaretti's testimony only on relevance. We thus conclude that Brooks forfeited this objection. (*People v. Lopez* (1978) 81 Cal.App.3d 103, 108 ["[O]bjections to evidence must state specific grounds for exclusion, and the grounds cannot be changed on appeal"].)

Brooks contends that the argument, even if forfeited, is nonetheless properly presented on appeal as part of a claim of ineffective assistance of counsel. The test for ineffective assistance of counsel requires a criminal defendant to establish both that his or her counsel's performance was deficient and that he or she suffered prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) "[I]f the record sheds no light on why counsel acted or failed to act in the challenged manner, we must reject the claim on appeal unless counsel was asked for an explanation and failed to provide one, or

16

there could be no satisfactory explanation for counsel's performance." (*People v. Castillo* (1997) 16 Cal.4th 1009, 1015.)  The record here sheds no such light, and defense counsel's decision not to object to the testimony as improper opinion testimony may have resulted from a choice within the range of reasonable competence.  Moreover, given Brooks's own testimony that he changed the lyrics of the song and intended for Ibe to switch the pronoun when she read it, it is unclear how Brooks could establish prejudice from the admission of Cesaretti's testimony on the same topics.  We thus reject Brooks's ineffective assistance of counsel claim.

Given our conclusion that Brooks forfeited this claim, we need not address his arguments that (1) the erroneous admission violated his due process rights, and (2) the error was prejudicial.  Having rejected Brooks's claims of individual error, we also reject his argument that multiple errors caused cumulative prejudice.

### D. A Remand for Resentencing Is Required Due to Assembly Bill No. 518

Brooks argues that this case should be remanded for resentencing because Assembly Bill No. 518 recently amended section 654 to give trial courts discretion to impose a lesser punishment.  The Attorney General agrees remand is required here, as do we.

At the time of Brooks's sentencing, section 654 required the court to punish an act that was punishable in different ways by different laws only "under the provision that provides for the longest potential term of imprisonment."  (Former § 654, subd. (a).)  The trial court therefore imposed the sentence for count one and stayed execution of the sentence for count four, which carried a shorter sentence than count one.

After we issued our original opinion in this matter, Assembly Bill No. 518 came into effect on January 1, 2022.  It amended section 654 to

17

provide the trial court with discretion to choose the count for which it will impose punishment. (Stats. 2021, ch. 441, § 1.) The California Supreme Court granted review and transferred the matter to us to reconsider our decision in view of the amendment.

The parties agree that Assembly Bill No. 518 applies retroactively to this case because Brooks's appeal was not final at the time the amendment came into effect. We agree with the parties' conclusion. (*In re Estrada* (1965) 63 Cal.2d 740, 744–745 [absent evidence of contrary legislative intent, ameliorative criminal statutes apply to all cases not final when the statute takes effect].) The court in *People v. Mani* (2022) 74 Cal.App.5th 343, applying the *Estrada* rule, found that Assembly Bill No. 518 applied retroactively where, as here, the defendant's appeal was not yet final. (*Id.* at p. 379–380.)

We also agree with the parties that Brooks is entitled to be resentenced by the trial court given the court's new discretion under Assembly Bill No. 518. " 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) Remand is therefore required "unless the record reveals a clear indication that the trial court would not have reduced the sentence even if at the time of sentencing it had the discretion to do so." (*People v. Almanza* (2018) 24 Cal.App.5th 1104, 1110.) Here, the record does not clearly indicate that the trial court would decline its discretion under Assembly Bill No. 518 to stay the sentence on count one and impose the sentence on count four. Although the trial court found multiple aggravating factors and only one mitigating factor, its reason for imposing the sentence on count one and staying the sentence on count four was former section 654. Remand is therefore required in this case.

18

Brooks further requests a remand for the trial court to consider the applicability of " 'other criminal justice reform legislation.' " The Attorney General admits that Brooks may be entitled to the benefit of other legislative changes because of the full resentencing rule, which permits the trial court to revisit all prior sentencing decisions when part of a sentence is reversed on appeal. (*People v. Valenzuela* (2019) 7 Cal.5th 415, 424–425.) Thus, upon remand, the trial court may revisit its prior sentencing decisions and consider new legislation, including, but not limited to, Assembly Bill No. 518.

DISPOSITION

This matter is remanded for resentencing consistent with the views expressed herein. In all other respects, the judgment is affirmed.

_____

Humes, P.J.

WE CONCUR:

_____

Margulies, J.

_____

East, J.*

*Judge of the Superior Court of the City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*People v. Brooks* A159421

20